Filed 7/26/18

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| In re ABELINO MANRIQUEZ | ) ) ) | S141210 |
| on Habeas Corpus. | ) ) ) | |

Petitioner Abelino Manriquez filed an original habeas corpus petition in this court seeking relief from his multiple murder convictions and death sentence. We issued an order to show cause with respect to petitioner's claim that prejudicial juror misconduct occurred when a juror did not timely disclose a history of childhood abuse.

After an evidentiary hearing, the referee found the juror's nondisclosure was neither intentional nor deliberate, and that the juror was not biased against petitioner; as such, there was no prejudicial juror misconduct. We agree generally with the referee's findings, and therefore hold that petitioner is not entitled to relief.

## I. PROCEDURAL BACKGROUND

Petitioner was sentenced to death in 1993 after a jury convicted him of four counts of first degree murder and found true, among other things, the special circumstance of multiple murder. (Pen. Code, §§ 187, 190.2, subd. (a)(3).) We unanimously affirmed petitioner's guilt verdict and death sentence. (*People v. Manriquez* (2005) 37 Cal.4th 547 (*Manriquez*).)

SEE DISSENTING OPINIONS

Petitioner filed this habeas corpus petition, his first, in 2006, and amended it in 2008. In claim 2 of the petition, he alleged the jury foreperson, C.B., had committed misconduct by concealing having been physically and sexually abused as a child. A pretrial juror questionnaire had asked prospective jurors whether they experienced any violent and criminal acts, and Juror C.B. generally responded in the negative. Petitioner produced C.B.'s posttrial juror questionnaire and a declaration, in both of which she had described being raped and beaten as a child — facts that were not disclosed on her pretrial questionnaire.

We issued to the Secretary of the Department of Corrections and Rehabilitation an order to show cause why we should not grant petitioner relief on the ground of juror misconduct. After considering the Attorney General's return and petitioner's traverse, we ordered a reference hearing. The order directed the referee to address four questions:

1. What were Juror C.B.'s reasons for failing to disclose her childhood abuse on her juror questionnaire and during voir dire at petitioner's trial?

2. Was the nondisclosure intentional and deliberate?

3. Considering Juror C.B.'s reasons for failing to disclose these facts, was her nondisclosure indicative of juror bias?

4. Was Juror C.B. actually biased against petitioner?

We appointed William C. Ryan, Judge of the Superior Court of Los Angeles County, as the referee. The referee conducted an evidentiary hearing in which Juror C.B. testified. The referee then filed a 14-page report with recommendations. Petitioner and the Attorney General filed postreport briefing, and petitioner presented his objections to the referee's report.

## II. TRIAL EVIDENCE

A lengthy recitation of the facts of petitioner's crimes is unnecessary; they are contained in our prior decision. (*Manriquez*, *supra*, 37 Cal.4th at pp. 552-

2

568.)  It is sufficient for our purposes to note the jury convicted petitioner of murdering four people on separate occasions, which made him eligible for the death penalty.

More relevant to our analysis is the evidence presented during the penalty phase.  During its case in aggravation, the prosecution presented evidence of petitioner's involvement in three additional killings, and that petitioner had raped a friend's babysitter at gunpoint.  (*Manriquez, supra*, 37 Cal.4th at pp. 568-570.)

"The defense evidence in mitigation was introduced through the testimony of five of [petitioner's] relatives, each of whom described the deprivation and abuse [petitioner] suffered as a child in rural Mexico.  The witnesses testified that [petitioner's] childhood was marred by extreme cruelty, vicious beatings, grinding poverty, forced labor, and a lack of care, education, affection, or encouragement by the adults in [petitioner's] life.

"Cecilia Manriquez Solis, [petitioner's] first cousin, testified that she and [petitioner] resided as children on a ranch they shared with her grandmother and [petitioner's] father, in Mexico.  The area in which the ranch was located lacked electricity, a school, church, store, or regular law enforcement, and none of the residences on the ranch had windows or doors.  The children worked from 3:00 a.m. to approximately 5:00 p.m. — farming, planting, and collecting firewood and water, every day of the year except Good Friday.  During the few years that Solis and [petitioner] resided together at the ranch, she observed him beaten several times, 'sometimes two to three times per day.'  These beatings included one occasion when [petitioner] was seven years of age:  he was tied to a tree and beaten with a whip, and Solis recalled that 'my grandmother got tired of hitting him, so my uncle, his father continued to hit him.'  On other occasions [petitioner] was beaten with a whip or a belt.  Such beatings occurred on a daily basis.  Once [petitioner] was hog-tied and left all night in a storage bin for corn.  Solis never

3

saw [petitioner] receive any sign of love or affection from his grandmother or his father.

"Cresencia Tamayo, [petitioner's] aunt, also resided at the ranch when [petitioner] was a young child, and testified that [petitioner's] chores also involved retrieving the 'cattle, beasts, burros . . . .' [Petitioner] was sent on errands, and if he failed to perform he 'would be hit or beaten' by his father, uncles, or grandmother, several times 'all over with the belt' or with a rod or stick. [Petitioner] and the other children worked each day of the year and never were allowed to play except 'for a little while' on Good Friday. 'There were no toys, [and] [t]here was no Christmas.' Rarely was any sort of affection shown to [petitioner].

"Joaquina Ward, who described herself as a half sister to [petitioner's] cousin Cecilia Manriquez Solis, testified that she also resided at the ranch for a few months when [petitioner] was a child. She recalled that the children 'were treated poorly' and that '[w]hen they didn't do what they were told to do, they were hit,' [petitioner] more often than the other children. On one occasion, Ward encountered [petitioner] 'tied by the legs and the hands,' because 'he had been sent up to the hills to retrieve some firewood; and because he did not bring the kind that his father had asked for, he was punished.' Ward untied [petitioner], after which 'he went down and turned into a little ball, and he stayed there crying.' She never saw anyone act affectionately toward [petitioner].

"Juan Manriquez, [petitioner's] cousin, testified that he resided with [petitioner] at the ranch and that the children were prohibited from playing; when they did, they were beaten with 'either a rod or a whip.' Manriquez recalled that [petitioner] was beaten 'for any reason,' two or three times per day, 'and we could hear his screaming when he was being beaten.' On one occasion, [petitioner] was caught bathing with his cousin, which led to another beating while [petitioner] was

4

tied up. When the boys' grandmother caught them eating fruit, she 'burned our feet so we couldn't run away and so we wouldn't do it again.' [Petitioner] attempted to run away numerous times, which in turn led to his being beaten. Ultimately, [petitioner] was able to run away and find his mother.

"Lorenza Sanchez, [petitioner's] half sister, testified that when [petitioner] was approximately 12 or 13 years of age, he came to live with her and their mother at the home where their mother was employed, at which time Sanchez first learned she had a half brother. They resided together for approximately four or five years, during which time they moved to a larger ranch — one that had a school — but [petitioner] did not attend the school, because he spent his time assisting other individuals in harvesting corn. During this period, [petitioner's] mother cohabitated with a man who beat Sanchez and her sister, actions that [petitioner's] mother witnessed, angering [petitioner] who once threw a brick at the man. Sanchez did not recall her mother showing any affection toward [petitioner]." (*Manriquez*, *supra*, 37 Cal.4th at pp. 570-571.)

### III. HABEAS CORPUS PROCEEDINGS

In support of petitioner's claim of juror misconduct, the following evidence was presented.

#### A. At Petitioner's Trial

Before the start of petitioner's 1993 trial, prospective jurors received written questionnaires. The prospective jurors signed the completed questionnaires under penalty of perjury.

In pertinent part, Question 63 of the questionnaire asked, "Have you or anyone close to you been the victim of a crime, reported or unreported?" On Juror C.B.'s questionnaire, the "No" answer was checked but crossed out, and the "Yes"

5

answer was checked.  C.B. wrote, "Home was robbed" one time, and listed her "[r]oommate before we lived together" as the victim.

Question 64 asked, "Have you or any relative or friend ever experienced or been present during a violent act, not necessarily a crime?"  Juror C.B. checked "No."

Question 65 asked, "Have you ever seen a crime being committed?"  Juror C.B. checked "No."

Question 66 asked, "Have you ever been in a situation where you feared being hurt or being killed as a result of violence of any sort?"  Juror C.B. checked "No."

Juror C.B. did not otherwise disclose any history of abuse, being a victim, or experiencing or seeing violence or a crime.  During voir dire, neither party examined her about these topics.  Because petitioner had peremptory challenges remaining when C.B. was in the jury box, he could have challenged her, but did not.  C.B. served as the jury's foreperson.

### B.  After Petitioner's Trial

A voluntary posttrial questionnaire asked, among other things, for suggestions that could be used to improve trials in the future.  Juror C.B. wrote, "The mitigating circumstances offered during the sentencing phase [were] actually a detriment in most of the [jurors'] minds, especially mine.  I grew up on a farm where I was beat[en], raped, [and] used for slave labor from the age of [five through] 17.  I am successful in my career and am a very responsible <u>Law</u> <u>abiding</u> citizen.  It is a matter of choice!"  (Underscoring in original.)

In a voluntarily given 2007 declaration, signed under penalty of perjury, Juror C.B. wrote, "Some of the questions on the [pretrial juror] questionnaire seemed to have no purpose.  Superficial questions about where you were brought

6

up, or your education, or income should be no one's business. I do not remember if questions were asked about whether we were victims of a crime." She added, "As to the mitigating evidence, I recall that [petitioner] grew up on a farm and was abused. I told the other jurors about what I had heard about farms in Mexico. But, I was regularly beaten from age three to age [17] while I lived with a foster mother on a farm in Pennsylvania. . . . At the farm there was also a home for aged people and one of the residents raped me when I was five. Having been through abuse myself, I do not view abuse as an excuse. I told the other jurors about my experience and my belief that childhood abuse was not an excuse. [¶] The abuse issue was discussed in the penalty deliberations. A couple of other jurors also had rough childhoods. I remember that one of the jurors . . . said he had a stepfather who would beat him once in a while. [¶] I had heard that life on farms in Mexico was real tough, with long work hours and very little food. Again, I did not accept this as an excuse and said so."

In a voluntarily given 2012 declaration, signed under penalty of perjury, Juror C.B. wrote, "When I was filling out the [pretrial] juror questionnaire, I answered the questions as honestly as I could. I did not attempt to conceal any information from anybody. When I answered the questionnaire, I was not thinking about the abuse I suffered as a child, because those are not memories I keep at the forefront of my mind. It was only after [petitioner] presented evidence of his childhood abuse as mitigating circumstances that I thought about the abuse I suffered as a child. [¶] Specifically, when I was asked in questions 63 through 66 of the [pretrial] juror questionnaire . . . I did not think that those questions were about things that happened to me during my childhood. Instead I believed the questions were asking about things that happened to me as an adult. That is the reason I did not disclose the fact that I was raped when I was five years old, or abused as a child." She explained, "I did not try to conceal the fact that I had been

7

raped and abused as a child, and freely shared that information with my fellow jurors during the penalty phase deliberations after [petitioner] offered evidence of his own abusive childhood as mitigating circumstances." She stated, "I was not biased against [petitioner], and based all of my decisions on the evidence that was presented during the trial."

**C. Evidentiary Hearing**

Juror C.B. testified at the evidentiary hearing, and her testimony was consistent generally with her posttrial questionnaire and declarations. C.B. was born in Pennsylvania, where as a child she lived on a farm. She testified that "in the [1950s] when I grew up, abuse was not a crime. Kids were abused all the time. And using kids for hard labor was very common."

Juror C.B. also testified about being physically abused by more than one person from the age five to approximately age 13 or 14. She had feared being hurt during her abusive upbringing. With respect to the sexual abuse, she testified to having been "molested." Before petitioner's trial, she had shared her childhood experiences with "only really close friends."

Juror C.B. had "several days" to complete the juror questionnaire. Before answering Questions 63 through 66, she thought about how to respond. During that process, her childhood experiences "did not come to mind." She understood, at the time of petitioner's trial, that the questions had no time parameters, that is, they were not confined to violent or criminal acts experienced only during adulthood.

With respect to Question 64, which asked about experiencing a violent act, Juror C.B. testified it was an important question that was not unduly invasive. She also understood that, under the "standards" at the time of petitioner's trial, molesting a five-year-old child was a criminal act and an act of violence, and that

8

physically abusing a child was also an act of violence. When answering Question 64, however, Juror C.B. did not disclose her childhood abuse because "the question indicated a violent act not necessarily a crime, and I did not consider my childhood a violent act." Similarly, she "did not consider anything in my life as criminal acts." She elaborated: "I did not consider myself a victim of a crime. I was a victim of circumstance. And that being said, I never thought of myself as having been a victim of any kind. So [at petitioner's trial], I did not even think about the fact that I had been criminally assaulted . . . . [¶] And as far as the molestation, it was a one-time thing, it never happened again. It went into the recesses of my mind. And it was not even thought of . . . until the very end of this whole trial." C.B. did not consider her childhood molestation to be an act of violence because "you had to be there. When you are growing up and that's your environment, you take it in stride."

Juror C.B. testified that, at the time of petitioner's trial, she completed the juror questionnaire honestly. She acknowledged, however, that in hindsight she should have answered both Question 64 and the inquiry regarding fear of being hurt in the affirmative.

Juror C.B. further testified that the penalty phase "triggered" her childhood memories. Specifically, she testified, "I know we're not supposed to say what other people were saying, but there was another [juror] who brought it up himself about having been beaten quite often by his father, and all of these things triggered in my mind my own abuse. [¶] . . . [¶] [W]e shared our life experiences for the jury's benefit to show we are productive people, we don't commit murders." She told the other jurors: "I had been raised in an abusive environment and had been molested, raped when I was five, and that I did not feel that was an excuse to become an unproductive, violent person in my adulthood."

Prior to the trial, Juror C.B. knew nothing about petitioner. She learned about petitioner's childhood for the first time during the penalty phase.

## IV. DISCUSSION

"Because a petition for a writ of habeas corpus is a collateral attack on a presumptively final criminal judgment, 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.' [Citation.] To obtain relief, the petitioner must prove by a preponderance of the evidence the facts that establish entitlement to relief." (*In re Cowan* (2018) 5 Cal.5th 235, 243.)

The law concerning juror concealment is settled. As this court explained in *In re Hitchings* (1993) 6 Cal.4th 97 at page 110 (*Hitchings*), "[w]e begin with the general proposition that one accused of a crime has a constitutional right to a trial by impartial jurors. [Citations.] ' "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' "

We have also explained the important role of the voir dire process: "The impartiality of prospective jurors is explored at the preliminary proceeding known as voir dire. '*Voir dire* plays a critical function in assuring the criminal defendant that [his or her] Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . .' " (*Hitchings*, *supra*, 6 Cal.4th at p. 110.)

"A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits

10

misconduct." (*Hitchings*, *supra*, 6 Cal.4th at p. 111.)  Such misconduct includes the unintentional concealment, that is, the inadvertent nondisclosure of facts that bear a " ' "substantial likelihood of uncovering a strong potential of juror bias." ' " (*In re Boyette* (2013) 56 Cal.4th 866, 889 (*Boyette*).)

"Once a court determines a juror has engaged in misconduct, a defendant is presumed to have suffered prejudice.  [Citation.]  It is for the *prosecutor* to rebut the presumption by establishing there is 'no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " (*People v. Weatherton* (2014) 59 Cal.4th 589, 600; see *People v. Thomas* (2012) 53 Cal.4th 771, 819.)  In other words, a concealment creates a presumption of prejudice, but it can be rebutted by a showing that there is no substantial likelihood of actual bias.  Whether the prosecutor has discharged his or her burden is for the court to decide.

An *unintentional* concealment caused by an honest mistake during voir dire, however, "cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias.  Moreover, the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300 (*Hamilton*); see *Boyette*, *supra*, 56 Cal.4th at p. 890 [the unintentional nature of a juror's nondisclosure "supplies sufficient support" for the ultimate finding of no substantial likelihood of actual bias].)  *Hamilton*'s holding acknowledges the possibility that, in a rare case, a court ultimately may determine that a juror's innocent concealment masked a substantial likelihood of actual bias.

"Although juror misconduct raises a presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test.  That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding

11

circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' [Citation.]  In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias." (*Boyette*, *supra*, 56 Cal.4th at pp. 889-890; see *Hamilton*, *supra*, 20 Cal.4th at p. 295; *People v. Nesler* (1997) 16 Cal.4th 561, 578 (plur. opn.); *Hitchings*, *supra*, 6 Cal.4th at pp. 118-120.)

 "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts." (*Hamilton*, *supra*, 20 Cal.4th at p. 296; see *McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 555 (plur. opn.) ["To invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give"].)

Stated somewhat differently, with respect to a claim of concealment, a habeas corpus petitioner bears the initial burden of showing that a juror did not disclose requested material information.  If such a nondisclosure is shown, a presumption of prejudice arises.  An intentional concealment is strong proof of prejudice, while a showing that the nondisclosure was unintentional may rebut the presumption of prejudice.  Whether any nondisclosure was intentional is not dispositive; an unintentional nondisclosure may mask actual bias, while an intentional nondisclosure may be for reasons unrelated to bias.  The ultimate question remains whether petitioner was tried by a jury where a substantial likelihood exists that a juror was actually biased against petitioner.

A juror is actually biased if she or he has "a state of mind . . . in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party."

12

(Code Civ. Proc., § 225, subd. (b)(1)(C).) As explained in the plurality opinion in *People v. Nesler*, *supra*, 16 Cal.4th 561 at pages 580 to 581, "[w]hat constitutes 'actual bias' of a juror varies according to the circumstances of the case. [Citation.] . . . ' "[L]ight impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but . . . those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him [or her]." ' "

With these principles in mind, we turn to the questions we posed to the referee and the responses he provided. The referee acts as " 'an impartial fact finder for this court.' " (*Boyette*, *supra*, 56 Cal.4th at p. 887.) " 'The referee's factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting. [Citations.] However, such findings are entitled to great weight where supported by substantial evidence.' " (*Ibid.*) We generally defer to a referee's determination of witnesses' credibility " ' "because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying." ' " (*Id.* at p. 877.) We "independently review the referee's resolution of legal issues and of mixed questions of law and fact." (*In re Crew* (2011) 52 Cal.4th 126, 149 (*Crew*).)

### A. Evidentiary Objections

Preliminarily, petitioner challenges some of the referee's evidentiary rulings.

### 1. Evidence Code Section 1150

Petitioner's habeas corpus counsel, when inquiring how Juror C.B. reacted at the trial during the penalty phase, asked her, "[W]hen you heard evidence of

13

[petitioner's] abuse from working on the farm, did you think, well, so was I?" Citing section 1150 of the Evidence Code, the referee struck C.B.'s response.

Although petitioner objects to the referee's ruling, it was correct: "Evidence of a juror's mental process — how the juror reached a particular verdict, the effect of evidence or argument on the juror's decisionmaking — is inadmissible." (*Boyette*, *supra*, 56 Cal.4th at p. 894 [citing Evid. Code, § 1150, subd. (a)].) Petitioner correctly notes that "the rule against proof of juror mental processes is subject to the well-established exception for claims that a juror's preexisting bias was concealed on voir dire." (*Hamilton*, *supra*, 20 Cal.4th at pp. 298-299, fn. 19.) The question actually posed to Juror C.B., however, inquired about her thoughts *as she was hearing petitioner's evidence*, and thus solicited quintessential evidence of her mental process. It plainly was not directed at C.B.'s state of mind during voir dire. And it inquired about neither her purported *preexisting* beliefs nor her purported concealment; rather, it solicited evidence of how petitioner's presentation of his case in mitigation was affecting her decisionmaking process. Moreover, petitioner's contrary suggestion notwithstanding, the question did not attempt to solicit an admission from C.B. that, due to her own impressions and opinions, she was unable to render a verdict based on the evidence presented. We therefore overrule petitioner's objection to the referee's ruling on this question.

### 2. Evidence of Bias

Over petitioner's objection, respondent's counsel asked Juror C.B. if she was biased against petitioner "at any time while you were a sitting juror in this trial?," and she responded, "No, sir, I was not." She conceded, however, that she did not know the legal definition of "bias." The referee in turn found that C.B.

14

was not biased against petitioner in part due to her testimony that she was not biased.

Petitioner challenges this testimony and finding, first noting Juror C.B. is not a lawyer, and that she conceded she did not know the legal definition of "bias." Petitioner also contends the referee prevented the parties from exploring her understanding of the meaning of "bias": When C.B. was asked if she was biased against petitioner, petitioner's counsel objected, arguing in relevant part that the question called for a legal conclusion. The referee overruled the objection, determining that the question was "not asking as a matter of law [but] asking as a matter of fact."

We agree with petitioner that the referee's findings could not properly be based *solely* on Juror C.B.'s belief that she was not biased against petitioner. *People v. Allen and Johnson* (2011) 53 Cal.4th 60 (*Allen and Johnson*), in which the trial court dismissed a juror for refusing to deliberate, is instructive. In finding that the juror was not deliberating, the trial court relied in part on the other jurors' opinions that the juror in question was refusing to deliberate. In the course of concluding that the trial court had committed reversible error, we observed that a court "cannot substitute the opinions of jurors for its own findings of fact." (*Id.* at p. 75.)

And, as petitioner notes, jurors are sometimes unaware of their own biases, or are reluctant to admit to having biases. Accordingly, when assessing Juror C.B.'s possible bias, we will not consider the referee's finding that C.B. believed she was not biased to the extent the referee relied on C.B.'s *assessment of her own bias*. As we will explain, however, the record as a whole before us contains substantial evidence that supports the referee's findings, including his findings regarding C.B.'s credibility and his ultimate finding that she was not actually biased.

15

**B. Questions Posed**

We note at the outset that the referee found Juror C.B. to be a credible witness; specifically, that she testified in a "direct, responsive, thoughtful and consistent manner" to the questions posed, and "was not evasive, uncooperative or defensive." The referee also found C.B's credibility was enhanced by her voluntarily completing the posttrial questionnaire and by voluntarily complying with the parties' pre-reference hearing requests for more information. In other words, the referee reasoned, if C.B. had a "hidden agenda," she simply could have remained silent.

Petitioner contends the referee's findings, including the findings concerning Juror C.B.'s credibility, are not supported by substantial evidence. We will address each question, the referee's findings, and petitioner's contentions in turn.

*1. Question One: What Were the Reasons for Nondisclosure?*

Our first question inquired about Juror C.B.'s reasons for not disclosing her childhood abuse. At the time of petitioner's trial, Juror C.B. understood that sexually abusing a child was a criminal and violent act; she also understood that physically abusing a child was a violent act. The referee found, however, that C.B. did not disclose the childhood abuse that *she* had personally suffered because she did not consider *her* childhood experiences to have been criminal or violent acts.

The referee further found that the experience of being a child in the 1950s supported Juror C.B.'s explanation why she did not initially disclose her childhood experiences. Juror C.B. testified her childhood experiences did not come to mind when she was completing the pretrial juror questionnaire because she "did not consider [her]self a victim of a crime." The referee reasoned that her belief her childhood experiences were neither crimes nor acts of violence "is consistent with

16

how society viewed and treated abuse of children 60 years ago, as distinct from how society now views and treats such abuse."

The referee accepted Juror C.B.'s explanation and found no conflict in her testimony. In doing so, the referee noted that C.B. acknowledged she had been present during a violent act, that is, her childhood sexual and physical abuse. She also acknowledged the questionnaire did not have any time parameters, and were not specifically limited to her adult experiences. Nonetheless, the referee concluded, because C.B. did not consider herself the victim of a crime or a violent act, her childhood experiences did not come to mind when she was completing the pretrial juror questionnaire.

In sum, the referee found that, in her mind, Juror C.B.'s childhood sexual and physical abuse were not criminal and violent acts, but rather were simply a part of life. As such, and despite their presumably traumatic nature, he determined, when completing the pretrial juror questionnaire, C.B. did not believe they constituted crimes or acts of violence.

Petitioner challenges the referee's findings regarding both Juror C.B.'s credibility and her reasons for not disclosing her childhood experiences. Because the two findings are inextricably linked, we will discuss them together, and, as we will explain, we adopt these findings.

Fundamentally, petitioner rejects Juror C.B.'s explanation that Questions 63 through 66 did not trigger any memories of her childhood experiences. Her explanations could not be credible, he contends, because they were inconsistent and therefore not all true.

Petitioner notes Juror C.B. acknowledged that the questionnaire did not contain any time parameters, that is, it was not limited to events that occurred during adulthood. Yet, in her 2012 declaration, which she reaffirmed during the evidentiary hearing, C.B. expressed the belief that the questionnaire applied only

17

to events during her adulthood. Similarly, she acknowledged that sexually abusing a child is a criminal and violent act, and that physically abusing a child is a violent act. But her personal sexual and physical abuse was, in her eyes, neither a criminal nor a violent act.

Petitioner is correct that Juror C.B.'s responses cannot all be reconciled. For example, she could not have believed the questionnaire both had no time parameters and was limited to events that occurred during her adulthood. But the referee appears to have resolved her seemingly contradictory responses by acknowledging that societal beliefs about the treatment of children in the 1950s might have differed from contemporary attitudes.[1] That is, it would appear C.B.

---

[1] Petitioner contends Juror C.B's beliefs, as well as the referee's findings, regarding societal views in the 1950s about children are "unsupported." Her beliefs undoubtedly were formed and supported by her own personal experiences, by those of the people around her, and by the changes she has experienced. And it would appear her beliefs are shared by others. (E.g., Lukens, *The Impact of Mandatory Reporting Requirements on the Child Welfare System* (2007) 5 Rutgers J.L. & Pub. Pol'y 177, 191 ["Until the mid-1960s, identification by [child protective services] agencies of children suffering from mistreatment by their families was a haphazard project"]; Weithorn, *Protecting Children from Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment Statutes* (2001) 53 Hastings L.J. 1, 42 ["By the second half of the twentieth century, child protection had become an important component of state and federal social agendas, ultimately resulting in the complex network of criminal and civil policies and agencies that now regulate various aspects of family relationships"], 51 ["[I]t was not until the mid-twentieth century that regulation of child labor became a fixture of American life, after many decades of bitter struggle"].)

Petitioner's concerns regarding *the referee's* finding about the changes in societal views are more well-founded. Other than Juror C.B.'s testimony, the record contains no evidence regarding the changes in societal views about child labor and child abuse. And, without additional evidence, such a generalized finding by the referee regarding the evolution of societal views is vague as to what is exactly being found, and also as to how such changes could be quantified or measured. (See Evid. Code, § 452, subd. (h) [a court may take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable

reasonably could believe that what might once have been treated as a "private matter" would likely today involve the criminal justice system and child protective services. Under this view, because C.B. did not believe her childhood experiences were violent or criminal acts, they would not have come to mind, regardless of the questionnaire's time parameters. And her answers support this finding. For example, when she was asked to explain her belief that the questionnaire was limited to events during adulthood, she responded, "I did not consider anything in my life as criminal [or violent] acts."

Petitioner seizes upon Juror C.B.'s statement that she "did not consider" any events in her life to have been criminal or violent acts to infer that, when completing the questionnaire, she in fact did recall her childhood experiences but then intentionally chose not to disclose them. He argues that contradicts her testimony that her childhood experiences did not come to mind until her memories were triggered during the penalty phase. We decline petitioner's invitation to read her testimony so literally. The totality of the evidence indicates that C.B. did not recall her childhood experiences until the penalty phase, notwithstanding her use of the word "consider" in describing her thought processes while completing the juror questionnaire.

In light of the alleged inconsistencies in Juror C.B.'s declaration and testimony, petitioner urges that we not defer to the referee's finding that she was a

of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"].)

Regardless, because Juror C.B. reasonably could have formed an opinion on the matter, and her opinion helps explain the consistency in her responses and her testimony, we need not address any finding the referee may have made on the general topic of societal views, other than to note substantial evidence in the record as a whole supports his finding that C.B. was consistent and therefore credible.

19

credible witness, but we decline the request. *Boyette* is instructive on this point. In *Boyette*, we ordered a reference hearing on a claim that a juror had engaged in misconduct by failing to disclose on a pretrial juror questionnaire his or his relatives' criminal histories and substance abuse problems. At the evidentiary hearing, the juror gave inconsistent reasons for his nondisclosure, but the referee ultimately found the juror had unreasonably albeit honestly misunderstood the questions. (See *Boyette*, *supra*, 56 Cal.4th at pp. 872-884.) We deferred to the referee's credibility findings because " 'we assume the referee considered those discrepancies, along with [the witness's] demeanor, while testifying, before concluding he was a credible witness.' " (*Id.* at p. 877.) We assume the referee did likewise when evaluating C.B.'s credibility.

Petitioner's contrary contentions notwithstanding, we also agree with the referee that Juror C.B.'s disclosure of her childhood experiences on the posttrial questionnaire suggested she did not have a "hidden agenda," which thus further enhanced her credibility. *People v. Ray* (1996) 13 Cal.4th 313 supports our conclusion. In *Ray*, a juror realized during the trial that he had a passing acquaintance with the victim's daughter, and he informed the trial court of this fact. We affirmed the trial court's decision not to further inquire into the juror's possible bias because, among other reasons, if the juror "had formed improper opinions about the case and intended to act in ways prejudicial to the defense, common sense suggests that [the juror] would have simply remained silent." (*Id.* at p. 344.) Petitioner is correct that, unlike the juror in *Ray*, C.B. did not disclose her childhood experiences until after the trial had ended. Petitioner is also correct that the timing of her disclosure frustrated petitioner's opportunity to explore C.B.'s possible biases while his trial was still in progress. But neither of those points refutes the referee's finding that she was credible.

20

Petitioner nonetheless argues that if Juror C.B.'s reasons for her belated disclosure about her childhood were sincere, she could and should have made her disclosure during deliberations, if not sooner. Even were we to agree that C.B. would have been more credible had she made her disclosure earlier, that does not necessarily render unbelievable her reasons for not disclosing until she did. Moreover, C.B. had the opportunity to refrain altogether from disclosing her childhood experiences, or from disclosing after the penalty phase verdict that she had discussed her experiences during deliberations. As she herself noted, she was testifying at the evidentiary hearing as a consequence of her voluntary disclosures on the posttrial questionnaire.

Accordingly, we reject petitioner's assertion that the referee's findings regarding Juror C.B.'s credibility are unsupported by substantial evidence. Instead, we conclude that, in light of the evidence presented, including the referee's assessment of C.B.'s demeanor while testifying, the referee reasonably accepted her explanation that she did not consider her childhood experiences when answering Questions 63 through 66, notwithstanding any possible tension between certain portions of her testimony.

Juror C.B.'s testimony, taken as a whole, shows she believed society formerly viewed criminal or violent acts committed on children differently from how it does today. As she repeatedly explained, when she was growing up, "abuse was not a crime. Kids were abused all the time. And using kids for hard labor was very common." Her stated beliefs about childhood abuse appear not to have been limited to her own personal experiences, but also included similarly situated children, and thus supported her assertion that she did not consider her experiences so extraordinary as to have been within the contemplation of the pretrial juror questionnaire. We therefore accept the referee's findings with respect to the first question because they are supported by substantial evidence.

21

## 2. *Question Two: Was the Nondisclosure Intentional and Deliberate?*

The second question we posed to the referee inquired whether Juror C.B.'s nondisclosure was intentional and deliberate. Preliminarily, we note that an intentional nondisclosure is strong proof that can sustain the presumption of prejudice raised by juror concealment.

C.B. specifically testified that, while completing the questionnaire, she tried to recall if she had been a victim of a crime but "nothing came to mind." For the reasons set forth in answering our first question, the referee also found that Juror C.B.'s nondisclosure of her childhood experiences was neither intentional nor deliberate. Specifically, the referee found that C.B.'s childhood experiences "did not come to mind" while she was completing the questionnaire, and that she therefore believed she had honestly and accurately answered Questions 63 through 66. Notwithstanding the "seeming clarity" of the questions posed, the referee found that she answered the questions "in good faith" and "with no intent to conceal or deceive."

Petitioner challenges these findings. He contends the questionnaire was clear, Juror C.B. had sufficient time to consider her answers, and her testimony regarding her nondisclosure was "inconsistent and incoherent." As we will explain, however, we disagree with petitioner because there is sufficient evidence that Juror C.B.'s nondisclosure was unintentional.

In support of his position, petitioner cites *People v. Blackwell* (1987) 191 Cal.App.3d 925 (*Blackwell*). In *Blackwell*, the defendant claimed she was a victim of alcohol-triggered domestic violence and had killed her husband in self-defense, but the jury rejected her defense and found her guilty of second degree murder. A juror who had indicated during voir dire that she had had no personal experience with domestic violence or alcoholism admitted after the verdict that her former husband had physically abused her when he was drunk. (*Id.* at p. 928.)

22

The Court of Appeal concluded that, if voir dire questioning is specific enough to elicit the undisclosed information and a juror nevertheless fails to disclose, this constitutes a prima facie case of juror concealment or deception. (*Id.* at p. 929.) From this, petitioner contends Juror C.B.'s failure to answer sufficiently specific questions also constitutes concealment.

*Blackwell*, however, is distinguishable and ultimately does not help petitioner. The Court of Appeal also observed in that case that nothing in the juror's declaration indicated that she misunderstood or was confused by the voir dire questioning, or that her failure to disclose the domestic abuse was due to an oversight or forgetfulness. (*Blackwell*, *supra*, 191 Cal.App.3d at p. 930.) In other words, the *Blackwell* court reasoned that the juror's nondisclosure was intentional because the questions were clear *and* no reason was given for not understanding the questions or not providing a responsive answer; the only *supported* inference was that the juror "was aware of the information sought and deliberately concealed it by giving false answers." (*Ibid.*) Regardless of the clarity of the juror questionnaire in petitioner's case, Juror C.B., unlike the *Blackwell* juror, provided the reasons for her nondisclosure. C.B. repeatedly and consistently explained that she believed her childhood experiences were not applicable to the questions posed and therefore they did not come to mind. The referee found her explanation to be credible, and we have adopted the referee's findings in this regard.

As the referee noted, "the *Blackwell* court found that the biased juror . . . had intentionally concealed information that should have been elicited on voir dire, and had committed misconduct. Such is not the case here as there was no intentional concealment." We have adopted the referee's finding that C.B. did not intentionally conceal her abuse, and we therefore reject petitioner's suggestion that the mere failure to answer a seemingly clear question alone rendered C.B.'s testimony incredible or otherwise indicated intentional concealment. (See *Boyette*,

23

*supra*, 56 Cal.4th at pp. 872-884, 889-890 [a juror's unreasonable but honest failure to answer clear questions was not prejudicial misconduct].)

Petitioner argues there is further support for his position in *People v. McPeters* (1992) 2 Cal.4th 1148. We observed that "[i]n view of the traumatic nature of the event and the specificity of the questions," it was highly unlikely that a juror's failure to disclose having been assaulted with a knife during an attempted rape and then pursued and stabbed by her assailant was inadvertent. (*Id.* at p. 1176 [discussing the facts of *People v. Diaz* (1984) 152 Cal.App.3d 926 (*Diaz*)].) Our brief discussion of the Court of Appeal's decision in *Diaz*, however, was aimed merely at contrasting the gravity of the undisclosed incident in that case with the relatively benign one that had occurred in *McPeters*, in which a juror belatedly realized he had failed to timely disclose a passing acquaintance with the victim's husband. Contrary to petitioner's suggestion, we have never established a rule that a juror's nondisclosure of a sufficiently traumatic event always is intentional and serves as indisputable evidence of concealment.

Petitioner further supports his position with citation to *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, in which we held the trial court did not abuse its discretion in granting the plaintiff's motion for a new trial in a medical malpractice lawsuit on the ground of prejudicial juror misconduct. In *Weathers*, two jurors had told the other jurors that Kaiser was a " 'good hospital' " and that a verdict for the plaintiff would " 'endanger[] the whole hospital system.' " (*Id.* at p. 107.) We affirmed the trial court's order, noting that "[i]t is apparent . . . that the court concluded that the [jurors'] concealment [during voir dire] was intentional." (*Id.* at p. 110, fn. 5.) Here, the referee found the concealment was inadvertent, a finding that we have concluded is supported by substantial evidence. Moreover, there were other acts of juror misconduct in *Weathers* that were not present in petitioner's trial. For example, during deliberations one of the jurors in

24

question had brought up the fact that the plaintiff was an African American woman and remarked that " 'where he came from, they don't "even let a black woman into the courtroom." ' " (*Id.* at p. 107.)

Similarly unhelpful to petitioner is *Young v. Gipson* (N.D.Cal. 2015) 163 F.Supp.3d 647, a federal district court case granting relief in a capital habeas matter. The petitioner in that case had been sentenced to death for three first degree murders, two of which involved robberies at gunpoint. (See *People v. Young* (2005) 34 Cal.4th 1149, 1165.)[2] The federal district court found merit to the petitioner's claim of prejudicial juror misconduct based on a juror's affirmative misrepresentations on a juror questionnaire and during voir dire questioning. The questionnaire inquired about familiarity with the locations where the offenses occurred. In answering the questionnaire, the juror denied any knowledge of the locations, and stated during voir dire that he had heard of some of the street names but had never been to where the crimes occurred. In a postverdict declaration, however, the juror stated that he knew the neighborhood "well." (He also indicated that he had been a member of the National Rifle Association since he was a teenager, despite denying any such membership on his juror questionnaire.) The federal district court granted habeas corpus relief, finding that the juror had not answered honestly the questions posed during jury selection.[3] (*Young v. Gipson*, at pp. 729-732 & fn. 25.) The juror in that case was

---

[2] This court affirmed the judgment in the automatic appeal (*People v. Young*, *supra*, 34 Cal.4th at p. 1166), and later summarily denied the petitioner's habeas corpus claim of prejudicial juror misconduct.

[3] The juror had disclosed on the questionnaire that he, like some of the victims, had been robbed at gunpoint. In the juror's later declaration, he specified that he was robbed at a location that was approximately one-half mile away from one of the crime scenes. Because the juror had disclosed being robbed *yet served*

25

personally familiar with the locations where the offenses had occurred, and then concealed that familiarity from the court and the parties. In contrast, Juror C.B. had no personal familiarity with the circumstances of petitioner's childhood; although she had some general knowledge about Mexican farms, nothing either on the pretrial questionnaire nor during voir dire would have alerted her to the possible relevance of such knowledge.

Petitioner also relies on *Sampson v. United States* (1st Cir. 2013) 724 F.3d 150 (*Sampson*). In *Sampson*, the defendant had pleaded guilty to capital crimes, but federal law required a jury to be empaneled to determine the penalty. The jury imposed the death penalty, but the defendant presented evidence during habeas corpus proceedings that one of the jurors willfully had concealed information during voir dire. The First Circuit, in affirming the district court's decision vacating the death penalty, ruled that the juror had failed to honestly answer material voir dire questions; indeed, the juror admitted to being deliberately dishonest during voir dire. (*Id.* at pp. 164-168.) *Sampson* therefore does not aid petitioner because the federal courts had found that the juror repeatedly and deliberately lied on her pretrial questionnaire and during voir dire, whereas Juror C.B.'s nondisclosure was much more limited and unintentional.

Petitioner finally contends Juror C.B.'s testimony that she carefully considered her pretrial questionnaire answers, and that she could not recall being a victim of any crime, is simply not credible due to the traumatic nature of her childhood. We reject this contention because, as we have explained, we have adopted our referee's finding that she was a credible witness. We therefore further

*on the jury*, the district court's findings about his honesty presumably referred only to the nondisclosure of his personal familiarity with the area.

26

reject petitioner's suggestion that the timing of C.B.'s disclosure necessarily indicates that she intentionally concealed her childhood experiences.

Petitioner posits that Juror C.B.'s testimony indicates other possible motives for her nondisclosure. For example, she testified that she thought some of the questions on the questionnaire were unduly invasive, and that until the trial she rarely had discussed her childhood experiences. Although we agree with petitioner that those sentiments could have been *possible* motives for intentional concealment, we also agree with the referee's finding, supported by substantial evidence, that C.B.'s nondisclosure with respect to these questions was unintentional.

We therefore conclude that, in light of the evidence presented, including the referee's ascertainment of C.B.'s demeanor while testifying, the referee reasonably found that her nondisclosure was neither intentional nor meant to conceal or otherwise deceive. Accordingly, we accept the referee's findings with respect to the second question because they are supported by substantial evidence.

### 3. *Question Three: Did the Nondisclosure Indicate Bias?*

The third question we posed to the referee inquired whether Juror C.B.'s nondisclosure indicated juror bias. She testified that, prior to the trial, she knew nothing about petitioner. She learned about petitioner's childhood for first time during the penalty phase.

Having found Juror C.B.'s explanation for her nondisclosure to be credible, the referee found that her nondisclosure did not indicate juror bias. According to the referee, C.B.'s responses on the pretrial questionnaire and her testimony during the evidentiary hearing indicated "she was attempting to provide full and honest answers, and that her nondisclosure was inadvertent." Based on his review of the whole record, the referee concluded that no juror bias existed.

Petitioner challenges these findings. He contends it is "irrelevant" that Juror C.B. knew nothing about petitioner prior to his trial. We disagree. If pretrial publicity, the pretrial juror questionnaire, or voir dire had alerted her to the possibility that his harsh upbringing would be an issue at trial, conceivably her memories about her own experiences might have been triggered earlier. That is, if C.B. had a reason to anticipate the importance of her own childhood experiences while completing the pretrial questionnaire or participating in voir dire, her nondisclosure may have indicated an attempt to conceal her own experiences, which could in turn indicate juror bias. Although her lack of knowledge regarding petitioner's upbringing earlier in the case is not dispositive of the issue of bias, it does bolster her explanation that it was only during the penalty phase in which memories of her own experiences were first "triggered."

Petitioner notes that the pretrial questionnaire was not limited to prospective jurors' experiences as adults. But it is also true that the questionnaire did not inquire specifically about childhood experiences. Moreover, there is no evidence before us to suggest that Juror C.B. specifically discussed her childhood experiences with anyone while she was completing her pretrial juror questionnaire, during voir dire, or during the guilt phase of petitioner's trial.

As petitioner acknowledges, this court has previously expressed doubts that a juror's honest mistake during the voir dire process can lead to the impeachment of a verdict for juror bias. (See *Hamilton*, *supra*, 20 Cal.4th at p. 300; see also *Boyette*, *supra*, 56 Cal.4th at p. 890.) Because we have accepted the referee's findings that Juror C.B. answered the pretrial juror questionnaire in good faith, we similarly accept the referee's finding that her nondisclosure was not indicative of bias.

Petitioner asserts that, unlike the jurors in *Boyette* and *Hamilton*, Juror C.B.'s nondisclosure hid her actual bias. These decisions ultimately do not help

28

him, however. In *Boyette*, the juror failed to disclose his or his relatives' criminal histories and substance abuse problems and yet there was no evidence linking these personal experiences with how that juror judged the defendant's case. (*Boyette*, *supra*, 56 Cal.4th at pp. 889-890.) Similarly, the juror in *Hamilton* inadvertently failed to fully disclose her exposure to pretrial publicity, yet there was no indication that the undisclosed exposure influenced her ability to evaluate the evidence in the case. (*Hamilton*, *supra*, 20 Cal.4th at pp. 300-301.)

Again, in light of the evidence presented in this matter, and the referee's assessment of Juror C.B.'s demeanor while testifying, the referee reasonably found that she had made an honest mistake while completing the pretrial juror questionnaire, which was not itself indicative of bias. A juror could, of course, intentionally conceal information for reasons other than bias, such as embarrassment or the desire to protect someone else. But nothing in the record before us suggests C.B. had any such motives while completing the questionnaire or during voir dire.

Our inquiry, however, does not end here. Although a finding of intentional nondisclosure would sustain the initial presumption of prejudice caused by juror concealment, substantial evidence supports the referee's findings that Juror C.B.'s unintentional nondisclosure indicates a lack of bias. We acknowledge, however, the possibility that C.B.'s honest mistake nonetheless hid a bias. We therefore must determine the ultimate issue — that is, whether petitioner has shown there is a substantial likelihood that C.B. was actually biased against petitioner.

### 4. Question Four: Was Juror C.B. Actually Biased?

In light of his findings regarding the first three questions, the referee also found that Juror C.B. was not actually biased against petitioner. Relying on *People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*), the referee found C.B. had

29

properly evaluated "the penalty phase evidence through the prism of her life's experiences," and was not actually biased in doing so.

Petitioner contests the referee's finding that Juror C.B. was not actually biased against him. Citing the well-established rule that impartial jurors must set aside their personal impressions or opinions and render a verdict based solely on the evidence presented in court, he contends Juror C.B. was unable to do this. We have exercised our independent review (see *Crew*, *supra*, 52 Cal.4th at p. 149) and, for the reasons explained below, we conclude that petitioner has not shown a substantial likelihood that C.B. was actually biased.

Petitioner preliminarily challenges the referee's finding that his trial counsel invited the jurors to consider their own life experiences. During the penalty phase closing arguments, trial counsel asked, "And before you judge him, put yourself in his place. Would you be the person you are today? No question you wouldn't be. Would you do the things he did? Maybe, maybe not." The referee inferred that Juror C.B. "simply accepted the invitation made by petitioner's counsel," did put herself in petitioner's place, and judged him negatively. Although the reasonableness of this particular inference is debatable, it is also not determinative of the ultimate issue of whether C.B. was actually biased against petitioner, and we therefore place no weight on this particular finding.

Relying on *Diaz*, *supra*, 152 Cal.App.3d at page 936, petitioner next contends that the possibility of prejudice is greater if the misconduct is committed by the jury foreperson — as Juror C.B. was for petitioner's trial — due to the influence that role may wield during jury deliberations. C.B. testified she and another juror shared their childhood experiences with the rest of the jury, but the record before us does not (and, indeed, under Evidence Code section 1150, cannot) reveal the influence, if any, these disclosures had on the jurors'

30

deliberative processes. Nor is there any indication in the record that the other jurors voted as they did simply because C.B. was the foreperson, and not, for example, because of the persuasiveness or strength of her opinion, the severity of the evidence in aggravation, or for any of innumerable other reasons unrelated to C.B. We therefore decline petitioner's invitation to automatically ascribe any significance to C.B.'s status as the jury foreperson.

We also note petitioner supports much of his argument with decisions finding prejudicial juror misconduct based on jurors' exposure to, referencing, or disseminating information that was not presented during the trial. Those cases are unavailing, however: A juror's impermissible reliance on extrajudicial information (that is, new facts) is different from a juror's more permissible reliance on her or his life experiences when evaluating the evidence presented at trial. (See *Allen and Johnson*, *supra*, 53 Cal.4th at pp. 76-78; *Wilson*, *supra*, 44 Cal.4th at p. 831 ["Nor was [the juror's] statement that he 'knows' more abuse occurred than was presented to the jury an instance of relying on facts not in evidence. . . . He merely drew [a permissible] inference from the evidence presented, drawn from his own life experiences, that more abuse probably occurred than was shown"].)

Jurors are actually biased if they cannot act "with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) A juror may, for example, harbor a general bias against a class of witnesses. In *People v. Thomas* (1990) 218 Cal.App.3d 1477 at page 1482, for instance, the Court of Appeal upheld the mid-deliberations dismissal of a juror who believed, "based upon personal experience, that police officers in Los Angeles generally lie." And in *People v. Barnwell* (2007) 41 Cal.4th 1038 at pages 1048 to 1054, we similarly upheld the mid-deliberations removal of a juror who also had a general bias against law enforcement officers. In *Allen and*

31

*Johnson*, *supra*, 53 Cal.4th at page 78, however, this court explained that although such categorical prejudgment of a *class* of witnesses is unacceptable, a juror may properly draw on her or his life experiences when determining whether a particular witness is credible. And here, there is no evidence that Juror C.B. found any class of witnesses to be incredible (or particularly credible). Indeed, there is no indication that she expressed doubt regarding the credibility of *any* witness, or otherwise questioned that petitioner had suffered childhood abuse. Rather, she came to a conclusion as to the weight to be given to the evidence that was presented.

Petitioner finds support for concluding that Juror C.B. was actually biased in the Hawaii Supreme Court's decision in *State v. Larue* (Hawaii 1986) 722 P.2d 1039 at pages 1042 to 1043. There, the court held that prejudicial juror misconduct occurred when a juror's own experience of being molested as a child, which she inadvertently did not disclose during voir dire and revealed for the first time during deliberations, caused her to find the young sexual assault victims to be credible. We express no opinion on the correctness of *Larue*'s holding. Instead, we observe that Juror C.B. did not rely on her personal experiences to vouch for a witness's credibility, and she did not otherwise engraft her own childhood experiences onto those of the mitigation witnesses' experiences.

Petitioner nonetheless identifies two possible bases in which the information Juror C.B. did not disclose during voir dire may have shown she was actually biased against him. First, C.B. was sexually abused as a child and therefore victimized by conduct similar to conduct described by the penalty phase evidence that petitioner had raped a woman. Second, C.B. had childhood experiences similar to petitioner's, which led her to reject this aspect of his case in mitigation.

32

With respect to the first basis, that Juror C.B. was the victim of conduct substantially similar to that petitioner was accused of committing, the record before us indicates there was evidence during the penalty phase trial that petitioner had raped a friend's babysitter at gunpoint (see *Manriquez*, *supra*, 37 Cal.4th at pp. 569-570), and that C.B. had once been raped or sexually assaulted as a child. There are differences between the two incidents, however. For example, petitioner had used a weapon during the rape whereas there is no evidence that C.B.'s assailant did. In addition, C.B.'s assault occurred decades before petitioner's trial, and there is no evidence in the record before us that the incident continued to traumatize her. Nonetheless, we accept petitioner's contention that the two incidents were sufficiently similar as to present a *possibility* of bias.

In support of his position, petitioner relies upon *Diaz*, *supra*, 152 Cal.App.3d 926, in which the defendant was charged with assault with a deadly weapon while armed with a knife. A juror in the case did not disclose during voir dire that she had previously been assaulted at knifepoint during an attempted rape. The juror revealed her prior attack to court personnel, who described the juror as being " 'prejudiced as to violent crimes.' " (*Id*. at p. 931.) After a midtrial hearing, the trial court denied the defendant's motion to dismiss the juror, and the defendant was later convicted. (*Id.* at pp. 930-931.) A divided panel of the Court of Appeal reversed, reasoning that "when a juror has been victimized by the same type of crime" as the defendant is accused of having committed, there is a "probability of bias." (*Id.* at p. 939.)

In *Diaz*, after the prosecution had rested its case, the juror related her experiences to a bailiff and a court clerk. When the court asked the bailiff his impression of the juror's impartiality, the bailiff stated, " 'My opinion, she is prejudiced as to violent crimes, especially [against] women. She is obsessed with rape, with victims, and the men who perpetrate this act. I cannot honestly say that

she would be an impartial juror as to violent crime. . . . [S]he does have a very acute obsession with rape.' " (*Diaz*, *supra*, 152 Cal.App.3d at p. 931.)  Setting aside the questionable propriety of a trial court soliciting its personnel's "impressions" of a juror (as opposed to limiting their testimony to what they had observed), the record before us does not show that Juror C.B. had any sort of similar "obsession."  To the contrary.  C.B. testified that, until the trial, she rarely had discussed her childhood experiences.  And the referee found her not to be defensive.  In sum, while a similarity between a juror's life experience and a crime alleged against a defendant certainly may create a possibility of bias, the impact the sexual assault had on C.B. does not create a *substantial likelihood* of actual bias.

Petitioner also refers to *Sampson*, the federal capital murder case in which a juror concealed, among other information, that her ex-husband had abused her and threatened her.  Petitioner seizes upon the First Circuit's statement that "[w]hen a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias. [Citations.]  In such a situation, the juror may have enormous difficulty separating her own life experiences from evidence in the case." (*Sampson*, *supra*, 724 F.3d at p. 167.)  Again, Juror C.B.'s inadvertent nondisclosure does not implicate the same possibility of bias as the circumstances presented in *Sampson*, in which the juror intentionally concealed information during voir dire and the posttrial proceedings regarding juror misconduct.  Moreover, the juror in *Sampson* lied about life experiences that were so painful that she " 'could not discuss those matters candidly, unemotionally or, often, coherently' " at the evidentiary hearing conducted years after the events had occurred (and years after the defendant's trial).  (*Ibid.*)  The *Sampson* juror's difficulty in separating her own life experiences from the evidence in that case was manifest.  C.B.'s testimony, in

contrast, was "direct" and "responsive," and there is no indication in the record that she ever was overcome with emotion or was otherwise incoherent. Although there is evidence that C.B. *applied* her life experiences when interpreting petitioner's mitigation evidence, the record does not support the inference that she had any difficulty separating her own experiences from the evidence in petitioner's case. We therefore decline petitioner's invitation to follow *Sampson*.

With respect to the second basis for finding actual bias, that Juror C.B. had childhood experiences similar to petitioner's that led her to reject this aspect of his case in mitigation, we have some doubts regarding the purported similarities in their respective experiences. The evidence before us regarding the details of C.B.'s childhood is somewhat scant: she was raised by a foster mother and had a "rough childhood" because she worked as "slave labor" on a farm in Pennsylvania. She explained that as soon as she was old enough, she had to work on the farm. The farm also had a home for retired people, and she was required to cook, clean, and otherwise care for the residents. She worked sometimes before school, after school, and during the entire weekend. She was often physically abused, and a resident of the home for retirees once had sexually assaulted her. In contrast, petitioner as a child worked on a farm in rural Mexico for 14 hours a day, 364 days a year. He did not attend school because there were none. And unlike C.B., petitioner also provided examples of some of the extreme cruelty he suffered at the hands of his relatives, such being tied to a tree and whipped, being hog-tied for an entire night in a storage bin, or having the soles of his feet burned so he could not run away. We have no doubt both suffered greatly. And certainly C.B. believed their childhood to be similar. But she also did not consider her experience to be unique. She explained that another juror also disclosed during deliberation that he had been beaten as a child. We do not view petitioner's and

35

C.B.'s experiences as comparable as petitioner insists, which lessens somewhat the likelihood of bias on this basis.

Petitioner contends nonetheless that Juror C.B.'s personal experiences improperly affected how she viewed petitioner's evidence in mitigation. As he points out, after petitioner's trial C.B. plainly and repeatedly stated that she did not consider petitioner's childhood abuse to be an excuse or mitigating because, although she too had been abused, she had not committed crimes. But there is no evidence before us as to when C.B. determined that childhood abuse was not a sufficiently mitigating factor.

Petitioner observes that the juror in *Blackwell*, *supra*, 191 Cal.App.3d 925, the case involving the juror who had committed misconduct by concealing her personal experiences with an abusive ex-husband, had relied on those experiences to reject the defendant's self-defense theory. The juror there, who had been able to escape her ex-husband without resorting to violence, stated in a declaration that she " 'was personally able to get out of a *similar situation* without resorting to violence,' " and therefore believed that the defendant should have been able to do the same had she wanted to. (*Id.* at p. 928.) Petitioner asserts that, like the *Blackwell* juror, Juror C.B. was biased against him because she did not consider his life experiences to be an excuse or justification for his criminal behavior. *Blackwell* does not assist petitioner, however, because there, the Court of Appeal concluded the juror had intentionally given false answers during voir dire, which strengthened the presumption of prejudice. In addition, no evidence was presented in that case to rebut the presumption of prejudice. (*Id.* at pp. 930-931.) The same cannot be said here.

More fundamentally, as the referee noted, jurors generally are *expected* to interpret the evidence presented at trial through the prism of their life experiences. (*Wilson*, *supra*, 44 Cal.4th at p. 823.) In *Wilson*, also a death penalty case, both

36

the defendant and one of the jurors were African American. During voir dire, the juror testified he would not be biased either for or against the defendant due to their being of the same race. (*Id.* at pp. 821-822.) During the penalty phase deliberations, the juror explained to the other jurors that he found the defendant's mitigating circumstances compelling because, being an African American, he believed he had some insight into the negative family dynamics and harsh circumstances of the defendant's upbringing that non-African American jurors did not possess. (*Id.* at p. 814.) The trial court discharged the juror for misconduct, finding in relevant part that he had concealed his bias during voir dire and improperly considered race-based biases instead of the evidence presented. (*Id.* at p. 820.)

We held in *Wilson* that the trial court had abused its discretion in removing the juror, and vacated the penalty phase verdict. We noted that, unlike "the factfinding function undertaken by the jury at the guilt phase, 'the sentencing function [at the penalty phase] is inherently moral and normative, not factual; the sentencer's power and discretion . . . is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances.' [Citations.] Given the jury's function at the penalty phase under our capital sentencing scheme, for a juror to interpret evidence based on his or her own life experiences is not misconduct." (*Wilson*, *supra*, 44 Cal.4th at p. 830.) Because the penalty phase is less amenable than the guilt phase to burden of proof calculations (e.g., *People v. Winbush* (2017) 2 Cal.5th 402, 489), "a penalty phase juror properly considers 'personal religious, philosophical, or secular normative values' in making a penalty determination." (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 60; accord, *People v. Bell* (1989) 49 Cal.3d 502, 564.) And such considerations plainly contemplate jurors drawing upon their varied backgrounds and experiences when making these moral and normative decisions.

37

This different kind of decisionmaking distinguishes petitioner's case from *Blackwell*, *supra*, 191 Cal.App.3d 925, in which there was a substantial likelihood that the challenged juror had decided the defendant was guilty of murder because she believed it would have been possible for the defendant to have escaped her abusive husband without resorting to violence. In other words, there was a substantial likelihood the *Blackwell* juror had refused to decide whether the defendant's subjective fears were reasonable *under the facts actually presented*, but rather had judged the defendant by the facts of her own personal circumstances. In contrast here, there is no evidence before us to indicate that Juror C.B. did not believe petitioner was actually abused as a child, or that she had determined whether he was abused by comparing their respective childhoods. Instead, C.B. decided that the abuse petitioner did suffer was not sufficiently mitigating so as to warrant sparing him the death penalty.

In addition, petitioner's contrary contentions notwithstanding, Juror C.B.'s life experiences of childhood labor conditions on farms did not constitute "specialized information," nor did we intend in *Wilson* to restrict the scope or type of life experiences upon which jurors may rely. And to the extent petitioner contends C.B. committed additional misconduct by sharing her experiences with her fellow jurors, *Wilson*, again, anticipates that, as part of the deliberative process during the penalty phase, jurors will share with each other their reasons for accepting or rejecting the evidence that was presented: "[R]elying on an understanding, based on personal experience, of the effects of certain social environments and family dynamics on a young person growing up, when this understanding illuminates the significance or weight an individual juror would accord to related evidence in a particular case, is not misconduct." (*Wilson*, *supra*, 44 Cal.4th at p. 831.)

38

Although the juror in *Wilson* had some experiences similar to those of the defendant, notably, the juror was not a victim of any crime. As such, we are mindful that certain life experiences may create impermissible biases and others will not. And some jurors properly will use their life experiences to help shape their opinions, although other jurors may have been so affected by their life experiences that they have difficulty separating their own experiences from evidence of others' comparable experiences.

*Gonzales v. Thomas* (10th Cir. 1996) 99 F.3d 978 is instructive. In *Gonzales*, the defendant was convicted of, among other things, forcible rape. During voir dire, one of jurors denied having been involved in a " 'similar' " " 'incident,' " but during deliberations she revealed that, decades earlier, she had been " 'date raped' " when she was 19 years old and in school. (*Id*. at p. 982.) The federal district court ruled the juror had not been dishonest during voir dire because she genuinely perceived differences between her own experiences and the defendant's charged crimes. (*Id*. at pp. 984-985.) And, on appeal, the Tenth Circuit rejected the argument that a rape victim as a matter of law cannot be an impartial juror in the trial of an accused rapist. (*Id*. at p. 989 ["To hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims but also our entire jury system . . . "].) It then compared the juror's experiences with the charged crimes, noted the juror's relative lack of longstanding trauma and the passage of time, and rejected the defendant's contention that she was biased against him. (*Id*. at pp. 990-991.)

The same is true with Juror C.B.: Nothing in her background rendered her, as a matter of law, unable to sit as a juror in petitioner's case, and the record before us does not show that her childhood experiences made her predisposed to vote for the death penalty in petitioner's case. Rather, C.B.'s good-faith attempt to honestly answer the juror questionnaire rebuts the initial presumption of prejudice

created by her nondisclosure because it shows her lack of intentional misconduct. And petitioner's contention of a substantial likelihood of actual bias is unavailing in light of the totality of circumstances: (1) posttrial, C.B. voluntarily disclosed her childhood experiences; (2) she cooperated during the habeas corpus investigation; (3) she was calm, "forthright and candid" during the evidentiary hearing, and she displayed no defensiveness, zealotry, or obsession; (4) her experiences were only somewhat similar to petitioner's; (5) there was a notable passage of time between her experiences and petitioner's trial; and (6) there is no evidence that her life experiences had compromised her ability to evaluate the evidence before her.

In addition, there is no evidence in the record before us that Juror C.B. could not or would not deliberate with her fellow jurors; rather, her undisputed testimony indicated that she participated in the jury's deliberations. Nor is there any evidence that she had prejudged the case or otherwise entered deliberations with an impermissibly closed mind: Because jurors may form preliminary assessments about the case, that these assessments are not later swayed by their fellow jurors' opinions is not necessarily a form of prejudgment indicative of bias. (See *Allen and Johnson*, *supra*, 53 Cal.4th at pp. 75-76.)

Although it was misconduct for Juror C.B. not to answer the pretrial juror questionnaire accurately, there is no substantial likelihood she was actually biased against petitioner. Rather, as permitted, C.B. applied her life experiences when she interpreted petitioner's mitigating evidence and weighed it against the evidence in aggravation, that is, his four convictions of first degree murder, as well as evidence of his involvement in three additional killings and raping a friend's babysitter at gunpoint. As such, we reject petitioner's suggestion that C.B. was predisposed to reject the defense mitigation evidence, or was otherwise unable to act impartially.

40

We therefore accept the referee's findings (except as otherwise indicated) with respect to the fourth question because they are supported by substantial evidence, and we independently conclude that petitioner has not shown a substantial likelihood that Juror C.B. was actually biased against petitioner.[4] Accordingly, petitioner has not established that he is entitled to habeas corpus relief on his claim of prejudicial juror misconduct.

A similarity between a juror's life experiences and some aspect of the litigation may so call into question a juror's impartiality as to warrant exercising a peremptory challenge or otherwise discharging that juror. And because voir dire is intended in part to allow the parties to explore the prospective jurors' possible biases, we acknowledge that Juror C.B.'s nondisclosure deprived petitioner of the opportunity to do so. Regardless of her misconduct, however, the " ' "criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias." ' " (*Boyette*, *supra*, 56 Cal.4th at p. 897.) Such is the case here.

---

[4] Petitioner also argues that Juror C.B. was impliedly biased, if not actually biased. We recognize that there is nonprecedential federal case law concerning the constitutional guarantees of a fair trial and impartial jury that have implied bias even in situations when actual bias has not been shown. Indeed, a number of federal courts have implied bias "on the basis of similarities between the juror's experiences and the facts giving rise to the trial." (*Gonzales v. Thomas*, *supra*, 99 F.3d at 987; see *Hunley v. Godinez* (7th Cir. 1992) 975 F.2d 316, 319 [collecting cases in which courts have presumed bias because "the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial"].) But even were we to adopt this approach, it would not alter our conclusion in this case.

41

## V. CONCLUSION

We discharge the order to show cause.[5]  Because our order to show cause and our reference order were limited to this claim, we do not here address any other claims set forth in the habeas corpus petition, but instead resolve them by separate order.  (See *Crew*, *supra*, 52 Cal.4th at pp. 153-154.)

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR**:

**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

---

[5]    Petitioner's related request under Penal Code section 1181 to reduce his sentence to life imprisonment without possibility of parole is denied for the reasons stated in our opinion.

**DISSENTING OPINION BY LIU, J.**

Petitioner Abelino Manriquez was sentenced to death by a jury that included a member who was decidedly unpersuaded by Manriquez's mitigation evidence based on the physical and emotional abuse and deprivation he suffered as a child growing up on a farm. Nothing about this raises any eyebrows — until one realizes that the skeptical juror herself, in her own words, "grew up on a farm where I was beat[en], raped, [and] used for slave labor from the age of [five through] 17." This juror, C.B., described herself as "successful in my career" and as "a very responsible Law abiding citizen." "Having been through abuse myself," she said, "I do not view abuse as an excuse."

How, one might wonder, did this juror escape notice by defense counsel during jury selection and end up serving on the jury (as the foreperson no less) — despite items on the juror questionnaire that asked prospective jurors whether they had ever been a victim of crime or had ever experienced or witnessed a violent act? The answer is that Juror C.B. did not give accurate answers to these questions and, as a result, did not give either party any reason to inquire into her abusive childhood. Juror C.B.'s nondisclosure, though unintentional, was misconduct giving rise to a presumption of prejudice. (Maj. opn., *ante*, at p. 11.)

Today's opinion says prejudice from juror misconduct occurs in these circumstances only when the record reveals a substantial likelihood of actual bias. That standard is readily satisfied here. As Justice Franson cogently explains, there is a substantial likelihood — in light of Juror C.B.'s own account of how she

approached this case — that her predetermined mindset based on her childhood experiences prevented her from giving individualized consideration to the childhood abuse evidence actually presented in this case. This alone requires reversal of the penalty judgment.

But actual bias is not the only form of cognizable prejudice here. Juror misconduct during voir dire can also result in prejudice by distorting a defendant's consideration of which jurors to peremptorily strike and what defense strategy to adopt. Indeed, that is what happened in this case.

There are stark similarities between Manriquez's early life experiences and Juror C.B.'s. Both grew up on farms for the majority of their childhood, where they were often subjected to vicious beatings and forced into manual labor for long hours. (Maj. opn., *ante*, at pp. 3, 6–7.) Both had traumatic experiences marring their childhood: At the age of seven, Manriquez was once tied to a tree and lashed with a whip by his grandmother and uncle. On another occasion, he was hog-tied and left in a corn storage bin overnight. (*Id.* at p. 3.) At the age of five, Juror C.B. was raped by a resident of the farm where she lived. (*Id.* at p. 7.)

Juror C.B. failed to disclose any of this, despite being asked questions designed to reveal this information during jury selection. (Maj. opn., *ante*, at pp. 5–7.) Because of Juror C.B.'s misconduct, Manriquez was denied important knowledge about Juror C.B.'s disposition toward one of his main theories at the penalty phase. Had Juror C.B. revealed her prior experiences and disposition toward those experiences, any competent counsel would have struck her from the jury with a peremptory challenge. Indeed, why would any competent defense attorney keep on this jury a person who had herself grown up on a farm, was " 'used for slave labor,' " " 'regularly beaten,' " and " 'raped' " on the farm, and yet believed adamantly, despite those experiences, that " 'childhood abuse was not

2

an excuse' "? (*Id.* at pp. 6–7.) There is no question that Juror C.B.'s misconduct impaired Manriquez's right to exercise peremptory strikes.

In addition, Juror C.B.'s misconduct likely had a prejudicial effect on Manriquez's arguments at trial. One of his principal mitigation arguments was that his childhood was " 'marred by extreme cruelty, vicious beatings, grinding poverty, forced labor, and a lack of care, education, affection, or encouragement by the adults in [his] life.' " (Maj. opn., *ante*, at p. 3.) Defense counsel said to the jury during penalty phase closing arguments: " 'And before you judge him, put yourself in his place. Would you be the person you are today? No question you wouldn't be. Would you do the things he did? Maybe. Maybe not.' " (*Id.* at p. 30.) It is inconceivable that competent counsel would have made this statement if counsel had known of Juror C.B.'s past experiences and attitude toward those experiences, as the statement played right into Juror C.B.'s firm belief that her similar childhood trauma did not prevent her from becoming a " 'successful' " and " 'very responsible Law abiding citizen.' " (*Id.* at p. 6.) In sum, because of Juror C.B.'s omissions at voir dire, Manriquez was not afforded a fair opportunity to exercise peremptory strikes or appropriately craft his trial strategy.

Today's opinion says we must uphold the verdict if, in light of the entire record and the nature and circumstances of the misconduct, there is " ' "no *substantial likelihood* that one or more jurors were actually biased against the defendant." [Citation.] In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias.' " (Maj. opn., *ante*, at pp. 11–12, quoting *In re Boyette* (2013) 56 Cal.4th 866, 889–890.) But this limited inquiry does not adequately safeguard a defendant's right to a fair trial.

As the court recognizes: " ' "*Voir dire* plays a critical function in assuring the criminal defendant that [his or her] Sixth Amendment right to an impartial jury

will be honored. . . . [L]ack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . ." ' " (Maj. opn., *ante*, at p. 10, quoting *In re Hitchings* (1993) 6 Cal.4th 97, 110 [originally quoting *Rosales-Lopez v. U.S.* (1981) 451 U.S. 182, 188].) "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.] [¶] Without truthful answers on voir dire, the unquestioned right to challenge a prospective juror for cause is rendered nugatory. Just as a trial court's improper *restriction* of voir dire can undermine a party's ability to determine whether a prospective juror falls within one of the statutory categories permitting a challenge for cause [citations], a prospective juror's *false answers* on voir dire can also prevent the parties from intelligently exercising their statutory right to challenge a prospective juror for cause. [¶] Such false answers or concealment on voir dire also eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial. We have recognized that 'the peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury.' [Citation.] . . . '[J]uror concealment, regardless whether intentional, to questions bearing a substantial likelihood of uncovering a strong potential of juror bias, undermines the peremptory challenge process just as effectively as improper judicial restrictions upon the exercise of voir dire by trial counsel seeking knowledge to intelligently exercise peremptory challenges.' [Citations.] 'The denial of the right to reasonably exercise a peremptory challenge, be it by either the trial court *or a juror through concealing material facts*, is not a mere matter of procedure, but the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.' [Citations.]" (*In re Hitchings*, at pp. 111–112; see *Ex parte Dobyne* (Ala. 2001) 805 So.2d 763, 772 ["The form of

4

prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror."].)

*People v. Diaz* (1984) 152 Cal.App.3d 926 is instructive. The defendant was accused of committing an assault with a knife and causing great bodily injury. (*Id.* at p. 930.) During voir dire, a juror concealed the fact that she had been attacked at knife point during an attempted rape. (*Id.* at pp. 930–931.) On the last day of trial, the juror told court personnel of the knife attack. (*Id.* at p. 931.) Defense counsel asked the trial court to dismiss the juror, but because defense counsel refused to proceed with 11 jurors, the trial court denied the motion, and the defendant was convicted. (*Ibid.*) The Court of Appeal reversed, concluding that the juror's concealment prevented defense counsel from fairly evaluating whether to use a peremptory challenge. (*Id.* at p. 936 ["there is a strong inference of potential prejudice to defendant in his selection of a jury"].)

To see even more clearly the inadequacy of today's prejudice inquiry, suppose multiple jurors, not just Juror C.B., had made similar misrepresentations during voir dire that were directly relevant to Manriquez's mitigation arguments. And suppose those jurors are found not actually biased under the same inquiry that leads the court to find Juror C.B. not actually biased. In such a case, the defendant's right to exercise peremptory challenges would be illusory, and his opportunity to craft his trial strategy and arguments to the jury would be rendered a farce. Under the reasoning of today's opinion, such a defendant would have no recourse — a result plainly at odds with basic notions of a fair trial.

5

Because Juror C.B.'s misconduct resulted in prejudice to Manriquez during jury selection and during the penalty phase of his trial, I would grant his petition for relief from the penalty verdict.  I respectfully dissent.


**LIU, J.**


**I CONCUR:**

**FRANSON, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DISSENTING OPINION BY FRANSON, J.P.T.**

I join in Justice Liu's dissenting opinion. I write separately to address an alternate ground, which assumes the majority opinion adopted the appropriate legal standard for balancing a criminal defendant's Sixth Amendment and state constitutional rights to a trial by an impartial jury against society's interest in the finality of criminal judgments.[1] Applying that standard, the majority concluded there was no substantial likelihood that Juror C.B. was actually biased against petitioner. I respectfully dissent from that conclusion.

As outlined extensively in *People v. Manriquez* (2005) 37 Cal.4th 547, the details of petitioner's crimes are horrific, and overwhelming evidence was presented at trial to support his guilt. Petitioner presented a minimal defense of one law enforcement officer, who presented hearsay testimony from a witness to one of the killings, comprising six pages of reporter's transcript. (*Id.* at p. 567.) By this, he essentially conceded his guilt and focused his efforts to avoid a death sentence by presenting evidence of his traumatic childhood physical and mental abuse as mitigating circumstances. The role of petitioner's childhood abuse in his mitigation arguments is crucial to the ultimate issue of actual bias.

---

[1]    The question of the proper standard for analyzing a juror's failure to disclose material information during voir dire has produced a variety of approaches among the lower federal court and state courts. (See Lafave et al., 6 Criminal Procedure (4th ed. 2015) § 24.9(f), p. 681 [jury misconduct]; Loewy, *When Jurors Lie: Differing Standards for New Trials* (1995) 22 Am. J. Crim. L. 733 [survey and analysis of the various standards courts use in determining whether a juror's nondisclosure requires a new trial] (*Loewy*).) Part of the variety in approaches results from how lower courts apply *McDonough Power Equipment v. Greenwood* (1984) 464 U.S. 548, a civil case that did not involve the Sixth Amendment and produced a three-way split on the standard to be used. (See *Loewy, supra,* at pp. 739-741.)

With this backdrop, I address the second basis mentioned by the majority for a finding of actual bias—C.B.'s rejection of petitioner's traumatic childhood experiences as mitigating circumstances. In my view, the record establishes a substantial likelihood that (1) C.B. had a predetermined state of mind in reference to the case—specifically, the material issue of whether the childhood abuse that petitioner suffered could be a mitigating circumstance—and (2) C.B. relied on her strongly held belief that petitioner's childhood abuse was not an excuse to reject the petitioner's case in mitigation without giving individualized consideration to the evidence actually presented. Therefore, I conclude the record demonstrates a substantial likelihood of actual bias.

## I.  JUROR MISCONDUCT, REBUTTABLE PRESUMPTION AND ACTUAL BIAS

I agree that C.B.'s unintentional failure to disclose material information about her childhood was juror misconduct that raises a rebuttable presumption of prejudice. (Maj. opn., *ante*, at pp. 10-11.) When determining whether the prosecution has rebutted the presumption of prejudice that arises from juror misconduct, the court must independently determine from the entire record, including the nature of C.B.'s misconduct and "all the surrounding circumstances," whether there was no substantial likelihood she was actually biased against petitioner. (*In re Carpenter* (1995) 9 Cal.4th 634, 657; Maj. opn., *ante*, at p. 11; *In re Boyette* (2013) 56 Cal.4th 866, 890 (*Boyette*).) "All the surrounding circumstances" refers to C.B.'s statements, demeanor, and childhood experiences, but does not include the facts of the crimes. (Maj. opn., *ante*, at p. 40.) The substantial likelihood test is an objective standard. (*In re Hitchings* (1993) 6 Cal.4th 97, 118.)

In the context of juror misconduct in a criminal proceeding, "[a]ctual bias" is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ.

2

Proc., § 225, subd. (b)(1)(C); *People v. Wheeler* (1978) 22 Cal.3d 258, 273-274.) This definition of actual bias extends beyond hatred of or ill will toward a defendant personally or a class of which he or she is a member. As relevant here, actual bias exists when a juror "ha[s] been so affected by [her] life experiences that [she] ha[s] difficulty separating [her] own experiences from evidence of others' comparable experiences." (Maj. opn., *ante*, at p. 39.) To be sure, "jurors generally are *expected* to interpret the evidence presented at trial through the prism of their life experiences." (*Id.* at p. 36.) But here it is evident from C.B.'s comments about the similarity between petitioner's abusive childhood and her own abusive upbringing on a farm that C.B. had "difficulty separating her own experiences from the evidence in petitioner's case." (*Id.* at p. 35.)

## II.     APPLICATION OF DEFINITIONS TO THE FACTS

The existence of a state of mind on the part of C.B. on the issue of whether the childhood physical and mental abuse suffered by petitioner could constitute mitigating circumstances is not contested. During oral argument, the Attorney General acknowledged that C.B. had a "predetermined opinion" that petitioner's abuse was not an excuse. The Attorney General equated this to a predetermined mindset. Similarly, the majority acknowledges that "C.B. plainly and repeatedly stated that she did not consider petitioner's childhood abuse to be an excuse or mitigating because, although she too had been abused, she had not committed crimes." (Maj. opn., *ante*, at p. 36.)

C.B.'s declarations clearly establish her state of mind on petitioner's childhood abuse. In her 2007 declaration, C.B. described the abuse she suffered, compared it to petitioner's childhood abuse, and stated that "[h]aving been through abuse myself, I do not view abuse as an excuse." Also, based on her own experience of childhood abuse, C.B. openly acknowledged her "belief that childhood abuse was not an excuse" and that she communicated this belief to the other jurors. Furthermore, C.B.'s 1993 response to a

3

posttrial questionnaire explained the basis for her belief by describing her childhood circumstances and stating: "I am successful in my career and am a very responsible <u>Law abiding</u> citizen. It is a matter of choice!" These statements plainly identified C.B.'s belief—that is, her state of mind—that the kind of childhood abuse petitioner suffered, which she believed to be similar to her own experience, did not constitute an excuse or a mitigating circumstance.[2]

Further, C.B.'s predetermined state of mind about petitioner's childhood abuse prevented her from considering the evidence actually presented. Her attitude toward such abuse cannot be described as " ' "light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony." ' " (*Nesler*, *supra*, 16 Cal.4th at p. 581.) The categorical and emphatic manner in which C.B. repeatedly stated her belief, based on her own experience, that "childhood abuse was not an excuse" and her sharing these beliefs and experiences with her fellow jurors indicates that C.B. held " ' "strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force." ' " (*Ibid.*) Most notably, there is no indication in the record that C.B. was ever open to evidence that might run counter to her own experience or that C.B. actually considered the evidence presented at trial in evaluating the *particular* circumstances of petitioner's *individual* case, as opposed to making an unqualified judgment based on *her own* experiences.

---

**2** In contrast to the present case, courts often are required to draw inferences to determine a person's state of mind. Here, C.B.'s own statements provide direct evidence of her state of mind and the reasons that particular state of mind existed prior to the trial—that is, was predetermined. Accordingly, this is not a situation where we are required to apply an objective standard and draw inferences about whether extraneous evidence resulted in a predetermined state of mind. (Cf. *Boyette*, *supra*, 56 Cal.4th at p. 892 [information jurors acquired by watching a movie did not establish a substantial likelihood of bias during penalty phase].)

Accordingly, an evaluation of C.B.'s own undisclosed experiences of childhood abuse and the opinion she formed based on that experience are sufficient to establish a substantial likelihood that she could not impartially consider the evidence presented by petitioner.

The majority evaluates the evidence in the record differently and describes C.B.'s thought process by stating "C.B. decided that the abuse petitioner did suffer was not sufficiently mitigating so as to warrant sparing him the death penalty." (Maj. opn., *ante*, at p. 38) In addition, "C.B. applied her life experiences when she interpreted petitioner's mitigating evidence and weighed it against the evidence in aggravation." (Maj. opn., *ante*, at p. 40.) But these characterizations of C.B.'s decisionmaking are conspicuously bereft of any citation to C.B.'s own comments about how she actually responded to petitioner's evidence. Her comments do not reveal deliberative consideration of petitioner's individualized circumstances based on the evidence actually presented. They instead reveal a categorical application of a predetermined mindset based on C.B.'s own experiences.

The majority also concludes the evidence that C.B. was prevented from acting impartially was outweighed by her honesty, forthrightness, cooperation, the fact that her childhood experiences were "only somewhat similar," there was a notable passage of time between her experiences and the trial, and there was no evidence that her experiences had a traumatic or life-changing impact on her. (Maj. opn., *ante*, at p. 40.) As to the passage of time, C.B.'s undisclosed childhood events, however distant, obviously and strongly shaped her personal views, which led her to "plainly and repeatedly state[] that she did not consider petitioner's childhood abuse to be an excuse or mitigating [factor]." (Maj. opn., *ante*, at p. 36.) Thus, the passage of time does not reduce to insignificance the likelihood that C.B. applied her belief that abuse is not an excuse to categorically reject petitioner's childhood abuse as a mitigating circumstance.

5

Moreover, although the majority characterizes C.B.'s and petitioner's childhood experiences as "only somewhat similar," the crucial fact is that "certainly *C.B.* believed their childhood to be similar." (*Id.* at p. 35, italics added.)

The majority places great weight on the finding that C.B.'s nondisclosure was unintentional.[3] As evidenced by her honesty and candor in explaining her reasons for not disclosing her traumatic childhood, it is clear that C.B. did not appreciate that her mindset might disqualify her from sitting as a juror. Therefore, she was very open about her background and thoughts. Many people do not appreciate their personal bias or prejudices, and are therefore very open and honest about their thoughts and opinions. Such honesty does not lessen the likelihood that her vocalized state of mind prevented her from acting impartially—that is, weighing the evidence offered in mitigation instead of rejecting it based on a predetermined state of mind.

In evaluating the likelihood that C.B. actually weighed the evidence of petitioner's childhood abuse or, alternatively, categorically rejected it because abuse is not an excuse, I conclude there is a substantial likelihood C.B. applied her predetermined state of mind and categorically rejected that evidence in deciding to impose the death penalty. While C.B. *might* have undertaken an actual weighing of the evidence, there is a substantial likelihood she did not. The existence of this substantial likelihood is supported by (1) her own statements describing her mental process; (2) the similarity she perceived between her own experiences and petitioner's; (3) the categorical and unequivocal nature of her belief that childhood abuse is not an excuse; and (4) the fact she openly communicated her childhood experiences and her resulting belief to the other jurors. This evidence reasonably supports the inference that she considered them relevant to the case in

---

[3] But irrespective of whether the nondisclosure was intentional or not, the presumption of prejudice is justified because the harm caused by the nondisclosure was the same—it hid C.B.'s predetermined mindset.

6

mitigation. In contrast to *People v. Wilson* (2008) 44 Cal.4th 758, the evidence in this case is not readily susceptible to the inference that the juror's life experience was used to interpret or weigh the evidence presented. Here, there is a substantial likelihood C.B.'s life experience produced a specific attitude or prejudgment that led her to assign no mitigating weight to petitioner's childhood abuse without giving individualized consideration to the evidence actually presented.

In sum, the presumption of prejudice is not rebutted by a showing that there was no substantial likelihood of actual bias against the case in mitigation presented by the petitioner. Although the facts of the underlying crimes and the evidence in aggravation are horrendous, these facts are not relevant in determining C.B.'s mindset. A penalty phase verdict tainted by a substantial likelihood a juror was actually biased against a defendant must be reversed, "no matter how convinced we might be that an unbiased jury would have reached the same verdict." (*Nesler*, *supra*, 16 Cal.4th at p. 579.) I would grant the petition, vacate the judgment insofar as the penalty of death was imposed, and allow a retrial of the penalty phase.[4]

---

**4**      Before adopting a particular interpretation and application of statutory language, courts test that interpretation by considering the consequences that flow from it. (See *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291.) This court's interpretation and application of the definition of "actual bias" contained in Code of Civil Procedure section 225, subdivision (b)(1)(C) is subject to this test. One of the consequences of the majority's view of "actual bias" is that a juror with C.B.'s state of mind relating to childhood abuse and privation could not be challenged for cause based on actual bias. Thus, a defendant—even one whose case in mitigation is based primarily on evidence of childhood abuse and privation—would be compelled to exercise a peremptory challenge to avoid empaneling a juror who would categorically reject childhood abuse and privation as mitigating circumstances. In my view, such a result during the voir dire process could unduly impinge a defendant's constitutional right to an impartial jury.

**FRANSON, J.**<sup>*</sup>

**I CONCUR:**

**LIU, J.**

---

\*      Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Manriquez

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S141210
**Date Filed:** July 26, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert Armstrong


_____

**Counsel:**

Bingham McCutchen, Nora C. Cregan, Sarah Esmaili, Edward J. Donnelly, Todd A. Pickles, Tracy R. Roman, John R. Reese, Marta Miyar Palacios, Tom Clifford, Sujal Shah, Olivia Para, Dustin Brown, Robert A. Brundage, Elisa M. Cervantes, Nitin Jindale and Monica A. Hernandez for Petitioner Abelino Manriquez.

Bill Lockyer, Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Keith H. Boron, Sharlene A Honnaka, Jaime L. Fuster, Timothy M. Weiner and Kimara A. Aarons, Deputy Attorneys General, for Respondent the People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert A. Brundage
Bingham McCutchen
Three Embarcadero Center
San Francisco, CA  94111-4067
(415) 393-2000

Kimara A. Aarons
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6092