Filed 3/1/24  P. v. Johnson CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>ARMAH VICTOR JOHNSON,<br><br>    Defendant and Respondent. | F085013<br><br>(Super. Ct. No. DF014632A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Cynthia J. Zimmer, District Attorney, and Anthony Yim, Deputy District Attorney, for Plaintiff and Appellant.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

Armah Victor Johnson (defendant) was convicted by jury of multiple felony offenses.  After the jury was discharged, it was discovered that something unusual had occurred during jury selection.  Following a screening process involving the use of questionnaires, those remaining in the jury pool were randomly assigned numbers corresponding to locations on a seating chart.  The individual who later served as the

**SEE CONCURRING OPINION**

foreperson originally sat in seat 17, but he reportedly should have started out in a higher numbered seat. The prospective juror who should have initially occupied seat 17 also sat in the wrong place. The record does not explain exactly how or why this happened, but there is no dispute it was accidental.

The parties had full opportunity to voir dire both individuals, but apparently neither were singled out for questioning by counsel. However, to the extent counsel may have relied on their questionnaires, they could have mistaken one person for the other. Voir dire concluded with none of the remaining venire being challenged for cause. As a result of subsequent peremptory challenges, the person who had mistakenly sat in seat 17 was moved down to seat 10 and thus became part of the 12-person jury.

Upon learning of the above-described circumstances, defendant moved for a new trial on grounds of juror misconduct. The trial court found there was no misconduct. Nevertheless, it felt "forced" to grant the motion in light of defendant's averred "right to know exactly who the jurors are." Prejudice was not discussed in the ruling, and by all indications the trial court believed a structural error had occurred. The People appealed.

As we explain, there is no constitutional right "to know exactly who the jurors are." On the contrary, "even an anonymous jury is constitutional when warranted by the facts, and any prejudice in the ability to select a jury is not assumed but must be established, principally by analysis of the voir dire." (*People v. Goodwin* (1997) 59 Cal.App.4th 1084, 1092.) Defendant was convicted by 12 sworn jurors who underwent an extensive initial screening process for bias; were observable for body language and other nonverbal indicators; were subject to questioning by counsel; were passed over for cause; and were not peremptorily challenged. The seating error should be scrutinized for prejudice, but it does not constitute a structural defect in the trial process.

"Usually, when a trial court applies the incorrect legal standard in exercising its discretion, the appropriate disposition is to remand for the court to apply the proper

2.

standard." (*Doe v. Atkinson* (2023) 96 Cal.App.5th 667, 679.) Such is the case here. The cause will be remanded for the motion to be decided based on the applicable law.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant has been serving a life sentence in prison since 2001. In December 2019, he was charged with committing multiple felonies while incarcerated. For reasons not relevant to this appeal, the case did not go to trial until June 2022.

Defendant was tried before a jury on charges of battery upon a nonprisoner (Pen. Code, § 4501.5), resisting an executive officer (*id.*, § 69), and possession of a controlled substance (heroin) in a penal institution (*id.*, § 4573.6, subd. (a)). The jury returned guilty verdicts on all counts. Defendant was further alleged to have suffered a prior strike conviction (second degree murder) for purposes of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12). The strike allegation was found true in a bifurcated bench trial.

### *Jury Selection*

Jury selection began on June 29, 2022, with a panel of 35 prospective jurors. The trial court initially said only 33 people were available, but the clerk's transcript and subsequent remarks by the judge confirm the initial panel comprised 35 individuals. The panel members filled out two questionnaires: a two-page version addressing hardship and a 10-page version aimed at detecting grounds for removal for cause. The attorneys were told they could request individual questioning of any prospective juror, outside the presence of other panel members, based on the written responses.

What we will call "round one" of the preliminary screening process began with a hardship excusal based solely upon the responses to a questionnaire. Thus, the panel immediately shrank from 35 to 34 prospective jurors. Next, the trial court individually questioned 14 panel members for potential hardship and one panel member for potential bias. The attorneys were permitted to ask additional questions and occasionally did so. This resulted in eight more excusals for hardship and one for cause. At the end of the day, the trial court noted, "[W]e lost ten [panel members]."

3.

Round one continued the following morning, June 30, 2022, with further preliminary screening of the now 25-person venire. The trial court proposed a stipulation from counsel to remove three people for cause based on their questionnaires. The prosecutor agreed to removing all three, but defense counsel elected to question two of them. In the end, one was removed by stipulation, another was removed for cause without objection, and the third person remained on the panel over the prosecutor's objection.

The trial court decided to individually question eight more people, three of whom had also been questioned the previous day. The attorneys were asked, "[W]as there anyone else you wanted to talk to individually?" No requests were made. The further examinations resulted in one more panel member being removed for cause.

At the conclusion of round one, the trial court noted they had "lost 13 overall" and announced, "We only have 22 of you left." The court then explained it would be "bringing over another panel to go through the same [screening] process." Next, all but two of the remaining panel members were excused until later in the afternoon. The trial court spoke to both individuals about their scheduling concerns, and it excused one of them for hardship. This brought the total number of hardship excusals to 10, leaving only 21 people on the panel after accounting for the four removed for cause.

All told, 23 of the original 35 panel members appeared individually before the trial court and counsel for questioning or to be informed of their release based on questionnaire responses. Another panel member was excused for hardship before that process began. The record does not indicate whether the eventual foreperson, i.e., the so-called "wrongly empaneled juror," was among the 11 people who were not individually questioned in round one.[1]

---

[1]According to a declaration by the prosecutor, which was filed with the People's opening brief, neither the eventual foreperson nor the prospective juror who should have sat in seat 17 were part of the original 35-person panel. This is based on their alleged juror badge numbers,

4.

What we will call "round two" of the screening process began with a fresh 20-person panel filling out the same two-page and 10-page questionnaires. Upon review of the written responses, the trial court excused three people for hardship without further inquiry. Next, the court individually questioned nine or 10 panel members (the record is somewhat unclear) regarding potential hardship and/or bias. As before, the attorneys were permitted to ask additional questions. This process resulted in a fourth excusal for hardship and one prospective juror being removed for cause.

Following a lunch recess, round two continued with the individual questioning of seven panel members, two of whom were returning for a second time to provide updates on potential hardships. Of those seven prospective jurors, two were removed for cause. Another person in this group admitted partiality toward the prosecution based on prior employment with the California Department of Corrections and Rehabilitation (CDCR). The trial court expressed surprise when defense counsel elected not to challenge this person for cause. The prosecutor, who had been willing to concede such a challenge, made his own motion "in the interest of justice." Given the defense's position, the trial court denied the motion.

By the end of round two, the second panel had been whittled down to 13 prospective jurors. The two panels were then combined, resulting in a 34-person venire.[2]

which would indicate both were part of the second panel of prospective jurors, and that the eventual foreperson was twice spoken to about a potential hardship during the preliminary screening process. However, the information is hearsay and also constitutes evidence outside the record on appeal. Although we have explained the allegations, we view them as unsubstantiated and do not consider them in analyzing the dispositive issues. (See *People v. Young* (1978) 85 Cal.App.3d 594, 608 ["an appellate court cannot properly consider assertions of fact in an appellate brief when the facts are not of record"].)

[2]At the end of round two, the trial court remarked, "We have 35 total. … [¶] … I show 35 [remaining venirepersons]." Later, while addressing the entire group of remaining prospective jurors, the court said, "There's 33 of you out here …." These appear to have been inadvertent misstatements. The clerk's transcript and reporter's transcript show that out of the combined 55 prospective jurors among both panels (35 + 20 = 55), 14 were excused for hardship and seven

As explained, roughly 70 percent of those prospective jurors were individually questioned during rounds one and two. The attorneys were twice advised they could request further individual examinations based on the questionnaire responses, but neither side pursued that option.

According to the record, court staff "let jury services [know] who was excused," and "jury services" proceeded to create a "randomized list" used to assign each prospective juror to a space on a sequentially numbered seating chart. From that point on, all venirepersons were addressed by their seat number (e.g., "Juror #17") rather than by first and last names. This may explain, at least in part, why the seating mishap went undiscovered for so long.

After everyone appeared to have taken their assigned seats, the trial court began its "general voir dire" of the whole group. The judge peppered the venire with questions, most of which were directed to specific individuals. Some questions called for the raising of hands and/or a voluntary response from anyone. Through this process (documented across 32 pages of the reporter's transcript), the trial court managed to elicit verbal responses from all 34 panel members. The person occupying seat 17 was asked how he would interact with fellow jurors if placed on the jury, and he answered:

> "I would talk with them, give them my reasonings, and then see where they are coming from and try to get—just understand both sides, like, have them understand my side and understand their side. Just try to come up with their reasons."

Voir dire continued with questioning by defense counsel. The trial court had previously said each side would have 15 to 30 minutes depending on the venire's level of engagement and whether counsel was eliciting "new information" or a repetition of "the things they [had already stated in] their questionnaires" or prior answers to the judge's

---

were removed for cause (55 - 21=34). All 34 panel members responded to questions in a subsequent stage of voir dire, and nothing indicates that a 35th seat was ever occupied.

questions. Defense counsel was brief, choosing to individually question only "Juror #11," which the record indicates was the CDCR employee who had previously admitted leanings in favor of the People. The attorney also lectured the panel on basic legal concepts, e.g., reasonable doubt and the presumption of innocence.

The prosecutor's voir dire was not much longer than defense counsel's, but he utilized the time by actually questioning the panel. Responses were elicited from the people in seats 2, 10, 12, 13, 14, 15, 19, 25, 26, and 31. Neither the prosecutor nor defense counsel asked any questions of the eventual foreperson in seat 17.

Voir dire ended with defense counsel and the prosecutor both passing for cause. Only then was the panel informed that those occupying seats 1 through 12 following the exercise of peremptory challenges would serve as jurors. Although not explained to the panel in so many words, the trial court used a variation of what is colloquially known as the "six-pack" method. (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2023) § 29.15, p. 841.)

The traditional six-pack method involves 18 prospective jurors at a time; 12 are seated in the jury box "and the remaining six are seated in temporary chairs in front of the jury box." (Cal. Criminal Law: Procedure and Practice, *supra*, § 29.15, p. 841.) The group of 18 is questioned prior to the exercise of challenges. If someone in the jury box is later challenged and excused, "they are immediately replaced by the prospective jurors in the six temporary seats, in the sequence they are seated. No additional questioning is permitted." (*Ibid*.) If challenges continue to the point where all six temporary seats are vacated, the clerk calls six additional venirepersons to fill those seats. The six replacements are then questioned by the court and counsel before any further challenges are made. The process continues until both sides accept the jury as constituted by the 12 persons seated in the jury box. (*Ibid*.)

Here, the trial court modified the traditional method by predetermining the starting positions of all 34 panel members and questioning them as a group. Whatever variation

7.

is used, the six-pack method allows attorneys to be more strategic with their peremptory challenges since they know in advance which panel members will replace those in the jury box who are excused. "The disadvantage is that it often results in less thorough and individualized voir dire." (Cal. Criminal Law: Procedure and Practice, *supra*, § 29.15, p. 841.)

The prospective juror who originally sat in seat 17 was moved to seat 10 after the People exercised their third peremptory challenge. At that point defense counsel had used two peremptory challenges: the first against the CDCR employee who he had questioned during voir dire, and the second against a person originally located in seat 13. After using its third peremptory challenge to excuse the original occupant of seat 8, the defense stated its acceptance of the jury as then constituted by those in seats 1 through 12. The People used three more peremptory challenges, and the defense then chose to remove the person who had originally occupied seat 21. The defense had six peremptory challenges remaining when both sides accepted the jury.

***Discovery of the Seating Mistake***

Although the jury was sworn on June 30, 2022, opening statements and the presentation of evidence did not occur until July 5, 2022. Trial continued on July 6, 2022, with closing arguments and submission of the cause. The jury deliberated for approximately 30 minutes before reaching guilty verdicts on all counts.[3] The verdicts were recorded, and the jurors were excused that day.

The record contains unverified statements alleging the seating mistake was discovered on the date the jury was discharged. The attorneys reportedly met with the trial judge the next day, July 7, 2022, at which time further details were revealed. The

---

[3]The clerk's transcript indicates the jury retired to deliberate at 10:58 a.m. and returned with a verdict at 11:47 a.m. However, the record contains a note from the foreperson to the trial court showing the jury had reached its decision by 11:30 a.m.

following summary was later provided by the trial judge at the eventual hearing on defendant's motion for new trial:

> "During jury selection, my bailiff sat or called in randomly the person that should have been on the jury which was a [man with the initials M.B.]. At the end of the trial, … we found that a [man with the initials J.H.] actually took that seat, and [M.B. took J.H.'s seat]. [¶] They simply got mixed up. We found that out when [J.H.] went to the jury services at the end of the trial to get proof for his employer that he had sat as a juror and was told he had been released.… So instead of [M.B.] … sitting as a juror, [J.H.], [who has a very similar sounding last name], sat as a juror."

### *Motion For New Trial*

The trial court apparently set a one-month deadline for the filing of a motion for new trial. According to the transcript from a hearing on August 9, 2022, defense counsel failed to meet the deadline due to a medical issue. The trial court scheduled sentencing for September 20, 2022, but evidently gave the defense additional time to file its motion and agreed to hear the motion first.

#### **Defendant's Motion**

Defendant's motion for new trial was filed on September 16, 2022. It was supported by an attorney declaration and a two-page memorandum of points and authorities. The substantive contents of the declaration read as follows: "I am attorney of record for Defendant herein. [¶] I apologize to court and counsel for not filing this motion earlier. I have been off due to medical for a few weeks but expect to make a full recovery soon. [¶] I am informed and believe that each of the factual assertions contained [in the motion papers] is true and correct."

Defendant's notice of motion stated relief was being sought "on the ground that [he] was deprived of a fair trial in this matter due to the errors discussed herein," i.e., in the supporting papers. The first page of the supporting memorandum contained a boilerplate recital of generally applicable law. The second page asserted the following theory of entitlement to relief on statutory grounds of juror misconduct:

9.

"Penal Code [section 1181, subdivisions 2 and 3,] specifically call for a new trial 'When the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property' and 'When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented.'

"The instant case suffers from both errors. Due to a misunderstanding, an unauthorized person entered the jury room, became the jury foreman, and gave his opinions about the case. This constituted evidence out of court, and the jury was separated.

"A juror who discusses the case with nonjurors commits misconduct [citation]. The eleven proper jurors in this case committed misconduct, even without intent. [¶] As noted in *People v. Weatherton* (2014) 59 Cal.4th 589, a conviction cannot stand if even a single juror has been improperly influenced. In the instant case, the foreman, who was not an authorized juror, argued for guilt, and the jury returned a quick verdict of guilty."

**People's Opposition**

The People opposed the motion, arguing there was no misconduct and no evidence of prejudice. More specifically, "no evidence that the two switched jurors concealed any pertinent information from the Court or counsel, were biased against the Defendant, or that the mistake was anything beyond an accidental error." It was further argued "both jurors possessed incredibly similar last names and seemingly switched positions innocently due to the bailiff having only conducted roll call with their last names and failing to ever confirm the identity of those who entered in response to his call."

As part of their opposition, the People asked the trial court to unseal "(1) the names of the two switched jurors; (2) the questionnaires for the two switched jurors; and (3) the transcript from *voir dire*." The trial court granted the request and evidently considered the names and questionnaire responses in evaluating the defense motion. However, it appears the People failed to designate any of the unsealed material for inclusion in the record on appeal. This court granted a request by *defendant* to augment the record on appeal with reporter's transcripts from the jury selection process.

10.

**Trial Court's Motion Ruling**

On September 20, 2022, the motion for new trial was heard. Defense counsel declined to argue the motion, choosing instead to "submit it on our pleading." The prosecutor did present argument, briefly reiterating "[t]hat new trials and scenarios involving issues with the jurors generally require misconduct or some sort of prejudice."

The trial court gave the following reasons for granting the motion:

> "[The People] have some really good points, but it's just so different. It's different [from where] a juror doesn't reveal something that the juror should have because [in that scenario] we can determine whether or not prejudice occurred …. In this case, we're just talking about a different individual all together. I do agree with you looking at their questionnaires, they are pretty similar. Both from Cal State, both about—one's about ten years older, but I agree with [the People] on those points. However, I just—what we have is a situation where we had a juror sitting on the panel who is a stranger in one sense. We don't know who he is. Well, we have his questionnaire, but he just shouldn't have been sitting there, even though it was an innocent mistake.

> "And it's so different than any case that you pointed out or you cited to. I think I'm just forced. I don't think I have a choice. So I think I have to grant the motion for a new trial. As much as I don't want to, as much as I think there was a fair trial, I don't see anything in [M.B.'s] or [J.H.'s] questionnaire that would cause me concern, [but] I just think that the defendant has a right—as the People do, but the defendant has a right to know exactly who the jurors are, and he didn't in this case. So I think I have to grant it."

The People immediately appealed the ruling as authorized by Penal Code section 1238, subdivision (a)(3).

## DISCUSSION

### I.  Applicable Law re: New Trial Motions

Penal Code section 1181 permits a criminal defendant to move for a new trial on specified grounds that include juror misconduct. (*Id*., subds. 2, 3; *People v. Ault* (2004) 33 Cal.4th 1250, 1260.) Although the statute declares relief is available only on the grounds stated therein, "new trials may nonetheless be granted on grounds not

enumerated in the statute when necessary to protect a defendant's constitutional right to a fair trial." (*People v. Knoller* (2007) 41 Cal.4th 139, 158; see *People v. Fosselman* (1983) 33 Cal.3d 572, 582 ["the statute should not be read to limit the constitutional duty of trial courts to ensure that defendants be accorded due process of law"].) "[N]ew trials may be ordered for nonstatutory reasons when an error has occurred resulting in the denial of defendant's right to a fair trial, *and* the defendant has had no earlier opportunity to raise the issue." (*People v. Mayorga* (1985) 171 Cal.App.3d 929, 940.)

A defendant moving for a new trial generally has the burden of establishing both error and prejudice. (See, e.g., *In re Carpenter* (1995) 9 Cal.4th 634, 657 ["the initial burden is on defendant to prove the misconduct"]; *People v. Watts* (2018) 22 Cal.App.5th 102, 117 [where motion is based on nonstatutory ground of deficient representation, "the defendant has the burden of showing both the ineffectiveness of counsel and the prejudice it caused"].)

## II. Standard of Review

"On appeal, a trial court's ruling on a motion for new trial is subject to review for abuse of discretion." (*People v. Clair* (1992) 2 Cal.4th 629, 667.) Such rulings are accorded great deference. (*People v. Davis* (1995) 10 Cal.4th 463, 524.) "The trial court's factual findings, express or implied, made on a motion for new trial will be upheld if supported by substantial evidence." (*People v. Drake* (1992) 6 Cal.App.4th 92, 97.) Issues of law, on the other hand, are reviewed de novo. (*People v. Hinks* (1997) 58 Cal.App.4th 1157, 1160; see *People v. Patterson* (2017) 2 Cal.5th 885, 894 ["'[W]hen a trial court's decision rests on an error of law, that decision is an abuse of discretion'"].)

"Of course, the discretion to *grant* a new trial, while broad, is not unlimited. Before ordering a case retried, the trial court must make *its* independent determination, under article VI, section 13 of the California Constitution, both that error occurred, and that the error prevented the complaining party from receiving a fair trial." (*People v.*

*Ault*, *supra*, 33 Cal.4th at p. 1262.) In other words, "the trial court has 'no discretion' to award a new trial where no prejudicial error occurred." (*Id*. at pp. 1262–1263; see *id*. at p. 1272, fn. 15.)

### III.　Juror Misconduct Was Not Established

Section 1181 permits retrial when the jury has been "guilty of any misconduct by which a fair and due consideration of the case has been prevented." (*Id*., subd. 3.) At the motion hearing, the trial court described the seating mix-up involving M.B. and J.H. as "an innocent mistake" and "no one's fault." The trial court also said, "I don't think there was any misconduct on their part."

Defendant does not deny the plain meaning of the trial court's statements. Yet he argues that when read in "context …, it is apparent the court was referring to any intentional misconduct on the part of the jury." In essence, defendant claims (1) the trial court failed to consider the possibility of misconduct in the form of *unintentional* concealment; (2) that we should infer such concealment occurred during jury selection; and (3) the supposed concealment "raises a presumption of prejudice." The argument fails for multiple reasons.

First, the issue of concealment was addressed at the motion hearing. After making its ruling, the trial court granted the prosecutor's request "to make a more complete record" of the People's position. The prosecutor briefly discussed *In re Hitchings* (1993) 6 Cal.4th 97 and *People v. Green* (1995) 31 Cal.App.4th 1001, which were also cited in the People's opposition brief. Although *Hitchings* involved intentional concealment, the prosecutor cited it for the general principle that concealment can "undermine the jury voir dire process." (See *Hitchings*, at p. 111 ["A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct"].) The prosecutor then cited *Green* for the rule that any presumed prejudice arising from concealment can be rebutted. (See *Green*, at p. 1017,

13.

citing *Hitchings*, at p. 119 ["Juror misconduct raises a presumption of prejudice which 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist'"].) Basically, the prosecutor argued even if the voir dire process was "undermined," J.H. "had no ill will or bias towards the defendant." The trial court responded, "I agree. I don't think there's any ill will or bias by anyone."

Second, the cases upon which defendant relies involved nondisclosure of information known to the juror. (E.g., *In re Manriquez* (2018) 5 Cal.5th 785, 794–795 [failure to disclose having been the victim of a crime]; *In re Hitchings*, *supra*, 6 Cal.4th at p. 112 [juror possessed "greater knowledge of the case than she revealed on voir dire"].) Here, there is no evidence J.H. knew he was in the wrong seat during voir dire. When a new trial is sought for juror misconduct, "the initial burden is on defendant to prove the misconduct." (*In re Carpenter*, *supra*, 9 Cal.4th at p. 657.) Defendant did not meet this burden, nor can we imply any findings by the trial court regarding J.H.'s concealment of information he should have disclosed.

Third, defendant's "presumption of prejudice" argument overlooks the finer points of law in the cases he cites. "'*Once a court determines a juror has engaged in misconduct*, a defendant is presumed to have suffered prejudice.'" (*In re Manriquez*, *supra*, 5 Cal.5th at p. 797, italics added.) "An *unintentional* concealment caused by an honest mistake during voir dire, however, 'cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias.'" (*Id.* at pp. 797–798.)

"'Although juror misconduct raises a presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the "presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or

14.

more jurors were actually biased against the defendant." [Citation.] In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias.'" (*In re Manriquez*, *supra*, 5 Cal.5th at p. 798, quoting *In re Boyette* (2013) 56 Cal.4th 866, 889–890.)

To summarize, "[a] finding of 'juror misconduct "raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted."'" (*People v. Johnson* (2021) 10 Cal.5th 1116, 1171.) The trial court did not make an express or implied finding of misconduct; it found there was no misconduct. Assuming we could nevertheless construe the record as demonstrating unintentional concealment, that particular form of misconduct is harmless "'in the absence of proof'" the concealment somehow "'hid the juror's actual bias.'" (*In re Manriquez*, *supra*, 5 Cal.5th at pp. 797-798.) Defendant presented no evidence or argument suggesting even potential bias on the part of J.H. Moreover, the trial court affirmatively opined there was "no ill will or bias by anyone." Because defendant failed to establish the asserted statutory basis for granting a new trial, the trial court's ruling cannot be upheld on those grounds.[4]

## IV.    The Seating Error Was Not Structural

"A structural defect is the type of error 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' one that '"transcends the criminal process"' and 'def[ies] analysis by "harmless-error" standards.' [Citation.] Examples of structural defects include total deprivation of the right to counsel at trial [citation]; trial before a judge who is not impartial [citation]; and the giving of a constitutionally defective instruction on reasonable doubt [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 851.) Put differently, structural errors "go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence and are

---

[4]Defendant concedes his alternative argument below, based on section 1181, subdivision 2, lacked merit. His appellate brief acknowledges, "This was not a case where misconduct arose from improper discussions among jurors or consideration of extraneous evidence."

reversible per se."  (*People v. Anzalone* (2013) 56 Cal.4th 545, 554; accord, *Arizona v. Fulminante* (1991) 499 U.S. 279, 310.)

Case law recognizes "'at least three broad rationales' for treating an error as structural.  [Citation]  'First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest.  This is true of the defendant's right to conduct his own defense, which, when exercised, "usually increases the likelihood of a trial outcome unfavorable to the defendant."  … Second, an error has been deemed structural if the effects of the error are simply too hard to measure.  … Third, an error has been deemed structural if the error always results in fundamental unfairness.'"  (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1077, quoting *Weaver v. Massachusetts* (2017) 582 U.S. 286, 295–296.)

There is a strong presumption that errors are not structural, "and it will be the rare case where a constitutional violation will not be subject to harmless error analysis."  (*People v. Anzalone*, *supra*, 56 Cal.4th at p. 554; accord, *Neder v. United States* (1999) 527 U.S. 1, 8.)  "Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.'"  (*People v. Lewis* (2021) 11 Cal.5th 952, 973, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)  "However, state statutory error may amount to structural error if it is '"analogous to" … "the total deprivation of the right to counsel at trial."'"  (*Lewis*, at p. 973; see *Rose v. Clark* (1986) 478 U.S. 570, 579 ["if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis"].)

The trial court's remarks about "a right to know exactly who the jurors are" seem to imply the seating error was viewed as structural.  However, the nonexistence of such a constitutional right is evident from cases upholding the use of anonymous juries in criminal trials.  (See, e.g., *U.S. v. Pica* (2d Cir. 2012) 692 F.3d 79, 85, fn. 1 ["prospective jurors completed a detailed questionnaire, but their names, addresses, and workplaces

were not disclosed"]; *U.S. v. Yepiz* (9th Cir. 2017) 718 Fed.Appx. 456, 465 ["empaneling an anonymous jury 'requires withholding, at least, the jurors' names from the parties'"].) "Every court that has considered the issue has held that, when genuinely needed and when properly used, anonymous juries do not infringe a defendant's constitutional rights." (*U.S. v. Ross* (11th Cir. 1994) 33 F.3d 1507, 1519.) "Where jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself." (*Id*. at p. 1520; accord, *People v. Goodwin*, *supra*, 59 Cal.App.4th at p. 1092.)

Code of Civil Procedure section 237 has been interpreted as requiring disclosure of the names of prospective jurors during jury selection "unless the court determines that a compelling interest … requires that this information should be kept confidential or its use limited in whole or in part." (*Id*., subd. (a)(1).) But denial of this statutory right is not a structural error. In the few published decisions involving violations of the statute, such errors were held to be harmless. (E.g., *People v. Lopez* (2021) 65 Cal.App.5th 484, 489, 501–503; *People v. Phillips* (1997) 56 Cal.App.4th 1307, 1309–1310.) In *Lopez*, the appellate court noted defense counsel "had an extensive opportunity to inquire into any bias a juror may have had and to elicit additional information that could have revealed the juror's withholding of relevant facts." (*Lopez*, at p. 502.)

Defendant contends the seating mistake impaired his ability to exercise informed peremptory challenges. On the premise that such impairment amounts to a constitutional deprivation, he reasons the error must be structural because its consequences are "'necessarily unquantifiable and indeterminate,'" i.e., too difficult to measure by harmless error analysis. (Quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 150.) The argument is flawed.

Criminal defendants have a constitutional right to a fair and impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) This entitles them "to jurors who

17.

are qualified and competent, [but] not to any particular juror." (*People v. Holt* (1997) 15 Cal.4th 619, 656.) "The right to voir dire the jury is not constitutional, but is a means to achieve the end of an impartial jury. [Citation.] In addition, 'the peremptory challenge is not a constitutional necessity but a statutory privilege.'" (*People v. Ramos* (2004) 34 Cal.4th 494, 512; accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 673 ["'Peremptory challenges are intended to promote a fair and impartial jury, but they are not a right of direct constitutional magnitude'"].)

"The fact that an error implicates important constitutional rights does not necessarily make it structural." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178.) This is illustrated by the case of *Rivera v. Illinois* (2009) 556 U.S. 148, which arose from "a state trial court's erroneous denial of a defendant's peremptory challenge to the seating of a juror in a criminal case." (*Id*. at p. 151.) Appellant Rivera claimed "[t]he improper seating of a juror … is not amenable to harmless-error analysis because it is impossible to ascertain how a properly constituted jury—[i.e.], one without [the juror he wanted to remove]—would have decided his case." (*Id*. at p. 157.) He thus argued that "whatever the constitutional status of peremptory challenges, automatic reversal must be the rule as a matter of federal law." (*Ibid*.)

Rivera's claim was unanimously rejected by the United States Supreme Court: "If a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern. Rather, it is a matter for the State to address under its own laws." (*Rivera v. Illinois*, *supra*, 556 U.S. at p. 157.) "States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*. Or they may conclude … that the improper seating of a competent and unbiased juror does not convert the jury into an ultra vires tribunal; therefore the error could rank as harmless under state law." (*Id*. at p. 162.)

The California Supreme Court has also declined to classify errors affecting a criminal defendant's ability to voir dire and peremptorily challenge jurors as structural. In *People v. Black* (2014) 58 Cal.4th 912, the appellant alleged two of his challenges for cause were erroneously denied. Consequently, he was forced to use "two of his allotted peremptory challenges to remove the same jurors." The loss of those peremptory challenges resulted in the seating of a juror whom he had wanted to remove but could not because the trial court denied his request for additional challenges. (*Id*. at p. 914.) It was held that "[b]ecause no incompetent juror who should have been dismissed for cause sat on his case as a result of his exhausting his peremptory challenges," the alleged error was not prejudicial. (*Ibid*.)

The appellant in *Black* argued he was "entitled to 'mold the jury' using the full complement of peremptory challenges that [Code of Civil Procedure section 231] affords." (*People v. Black*, *supra*, 58 Cal.4th at p. 918.) He further claimed, "[w]ithout citation to authority … that denial of such an entitlement is reversible per se." (*Ibid*.) The California Supreme Court disagreed. "If no biased or legally incompetent juror served on defendant's jury, the judgment against him does not suffer from a federal constitutional infirmity …." (*Id*. at p. 917.)

The majority opinion in *Black* concludes with these statements: "The record does not show, and defendant does not contend, that Juror No. 8 was biased and removable for cause. (Cal. Const., art. VI, § 13.) This juror was not subject to removal for any other qualitative reason that would render his sitting in defendant's trial unfair or inconsistent with impartiality. The fact that the trial court refused defendant's request for an additional challenge to remove that same juror is not reversible error." (*People v. Black*, *supra*, 58 Cal.4th at pp. 921–922.) In a concurrence, Justice Liu opined that "[a] defendant cannot be said to have suffered substantial disadvantage with respect to the prosecution from the seating of a single objectionable juror [who is nevertheless qualified and competent to serve]." (*Id*. at p. 923.)

In *People v. Rices* (2017) 4 Cal.5th 49, the appellant in a death penalty case claimed three of his challenges for cause were erroneously denied and further alleged "the trial court impermissibly curtailed voir dire of prospective jurors regarding their attitude towards the death penalty." (*Id.* at p. 77.) Neither of the alleged errors were viewed as structural. Regarding the restriction on voir dire, because it "'did not deprive the defendant of *all* opportunity to ascertain jurors' views on case-specific facts,'" the alleged error was not reversible per se. (*Id.* at p. 78; see *People v. Cash* (2002) 28 Cal.4th 703, 722 ["Error in restricting death-qualification voir dire does not invariably require reversal of a judgment of death"].) The other claim was rejected for failure to "demonstrate that any sitting juror was biased and should have been excused for cause." (*Rices*, at p. 77 ["Accordingly, he has not shown prejudice even if we assume the court should have granted the challenges for cause to the three prospective jurors"].)

All the cases discussed above treated mistakes occurring in the jury selection process not as structural defects, but as errors subject to harmless error analysis based on (1) the protections otherwise afforded to the accused through voir dire and (2) evidence of bias, or lack thereof, as developed through that process. Framing the issue here in terms of whether juror J.H. was a "stranger" to defendant or not truly one of the 12 people he knowingly "accepted" as his jury does not make the alleged error structural. In *Rivera* and *Black*, for example, the appellants did not willingly accept all 12 jurors who decided their fate. (See *Rivera v. Illinois*, *supra*, 556 U.S. at p. 159 ["Rivera attempted to exercise a peremptory challenge against a specific person … whom he perceived to be unfavorable to his cause"]; *People v. Black*, *supra*, 58 Cal.4th at pp. 914 [defendant argued for reversal "because one of the jurors he objected to sat on his case"], 918 [rejecting structural error argument].)

"It is clear that knowledge of the composition of the entire panel can be relevant to the informed exercise of a peremptory challenge against a particular juror." (*People v. Wright* (1990) 52 Cal.3d 367, 397, disapproved on another ground as stated in *People v.*

20.

*Williams* (2010) 49 Cal.4th 405, 459.) However, "the fact that a particular procedure used might have made exercising initial peremptory challenges less informed does not in itself require reversal." (*People v. Avila* (2006) 38 Cal.4th 491, 538, citing *Wright*, at p. 397.) "Unless the voir dire 'is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.'" (*People v. Contreras* (2013) 58 Cal.4th 123, 143.)

The absence of structural error here is confirmed by scrutiny of the framework in question. "The United States Constitution 'does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.'" (*People v. Avila*, *supra*, 38 Cal.4th at p. 536.) "There is no constitutional right to voir dire per se. Nor is there any constitutional right to conduct voir dire in a particular manner." (*People v. Contreras*, *supra*, 58 Cal.4th at p. 143.) It is largely up to the trial court to determine how juror qualifications will be assessed, and "neither the state nor federal Constitution requires individualized voir dire questioning by attorneys." (*People v. Perez* (2018) 4 Cal.5th 421, 443.) The use of questionnaires is optional and subject to court approval. (Code Civ. Proc., §§ 205, 223, subd. (e); Cal Rules of Court, rule 4.201.) The parties have a statutory right to orally question prospective jurors (Code Civ. Proc., § 223, subd. (b)(1)), which was not curtailed by the jury selection process used in this case.

As previously explained, all prospective jurors underwent preliminary screening for bias. This entailed the completion of a 10-page questionnaire and individual questioning of most panel members, all of which occurred prior to the seating mishap involving J.H. and M.B. The process resulted in the removal of seven prospective jurors for cause.

Although the trial court initially chose which people would be separately examined based on their written responses, the attorneys had the ability to request questioning of additional panel members. The defense was thus afforded two distinct opportunities to ask J.H. about his questionnaire responses: once during the preliminary

screening (prior to the seating error) and again during group voir dire. Both sides had 10 peremptory challenges (Code Civ. Proc., § 231), which provided sufficient incentive to ask J.H. about anything of concern in his questionnaire regardless of whether counsel believed J.H. was located higher up in the 34-person seating chart.

Again, defendants have "a right to jurors who are qualified and competent, *not to any particular juror*." (*People v. Holt*, *supra*, 15 Cal.4th at p. 656, italics added.) When the framework used to select a fair and impartial jury provides adequate means and opportunity to detect grounds for removal for cause, errors occurring in that process will rarely be structural. In *People v. Mello* (2002) 97 Cal.App.4th 511, a trial judge told prospective jurors that if they were racially biased but afraid to admit it, they should lie about their bias and answer questions in such a way as to be excused on other grounds. (*Id*. at pp. 513–514.) The error was held structural because it "skewed the integrity of the entire voir dire process and adversely affected the manner in which the jurors would evaluate the evidence." (*Id*. at p. 519.) A "*Batson/Wheeler*" error is likewise structural because purposeful racial discrimination in the use of peremptory challenges is damaging to "'the structural integrity of the criminal tribunal.'" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172; see *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.)

In cases involving mistakenly seated jurors, whether due to concealment/nondisclosure or the erroneous denial of a challenge (peremptory or for cause), the problem is not the structural framework within which the error occurs. Moreover, the rationale for automatic reversal because prejudice is too difficult to measure does not apply since the test for prejudice is *not* what would have happened if the improperly seated person had not served on the jury. The test for prejudice is whether the error affected the defendant's right to a fair and impartial jury. In other words, whether the improperly seated juror was biased. (E.g., *People v. Ramirez* (2022) 13 Cal.5th 997, 1048 [denial of challenge for cause]; *In re Manriquez*, *supra*, 5 Cal.5th at

22.

pp. 797–798 [unintentional concealment/nondisclosure]; *People v. Black*, *supra*, 58 Cal.4th at p. 920 [denial of challenge for cause/deprivation of peremptory challenge]; *In re Hitchings*, *supra*, 6 Cal.4th at pp. 118–119 [intentional concealment]; *People v. Singh* (2015) 234 Cal.App.4th 1319, 1331–1332 [denial of peremptory challenge].)

In *People v. Green*, *supra*, 31 Cal.App.4th 1001, the jury foreperson was discovered to have concealed that he was previously convicted of a felony. (*Id.* at pp. 1012, 1016.) At the time, all convicted felons were barred from jury service (Code Civ. Proc., § 203, former subd. (a)(5)), meaning the foreperson was unqualified to serve on the jury as a matter of law. (*Green*, at p. 1016, fn. 13.) Nevertheless, the appellate court upheld the denial of the appellant's motion for new trial because there was no indication the juror's "status as an ex-felon affected his ability to be impartial." (*Green*, at p. 1019.) If the seating of an unqualified juror is not reversible per se, and the erroneous seating of a juror to whom the defense objected and challenged is not reversible per se (e.g., *People v. Black*, *supra*, 58 Cal.4th at pp. 916–918, 920–921), it stands to reason the seating of J.H. on defendant's jury is not reversible per se.

When mistakes occur that limit the availability of information about prospective jurors without completely removing the safeguards of voir dire and the ability to exercise statutorily guaranteed challenges, such mistakes can be harmless. (See *People v. Avila*, *supra*, 38 Cal.4th at pp. 535–538; *People v. Goodwin*, *supra*, 59 Cal.App.4th at p. 1092 ["even an anonymous jury is constitutional when warranted by the facts, and any prejudice in the ability to select a jury is not assumed but must be established, principally by analysis of the voir dire"].) The mistake here did not deprive defendant of the "'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.'" (*Neder v. United States*, *supra*, 527 U.S. at pp. 8–9.) Therefore, the jury selection process in this case did not suffer from a structural defect.

## V.    Remand is Warranted

"No judgment shall be set aside, *or new trial granted*, in any cause … for any error as to any matter of procedure, unless, after an examination of the entire cause … the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13, italics added.)  Therefore, unless retrial is mandatory due to structural error, a criminal defendant's motion for new trial cannot be granted without a finding of prejudice.  This is explained in *People v. Ault*, *supra*, 33 Cal.4th 1250.  "Before ordering a case retried, the trial court must make *its* independent determination, under article VI, section 13 of the California Constitution, both that error occurred, and that the error prevented the complaining party from receiving a fair trial." (*Id*. at p. 1262.)  If and when such a determination is made, it is entitled to deference and will be reviewed for abuse of discretion.  (*Id*. at p. 1272, fn. 15.)

The trial court seemingly believed the seating error was reversible per se.  Because of the apparent confusion regarding the scope of its discretion, it should be permitted to reconsider the motion for new trial on remand.  (See *Doe v. Atkinson*, *supra*, 96 Cal.App.5th at p. 679; cf. *People v. Lee* (2017) 16 Cal.App.5th 861, 875.)  While we have concluded the error was not structural, we also appreciate that the assessment of prejudice is challenging given the unique circumstances.  "[A]lthough *Watson* sets forth the test that generally applies to the prejudice inquiry under state law [citation], not every error is of the type that lends itself to resolution under a likelihood-of-success test." (*In re K.H*. (2022) 84 Cal.App.5th 566, 608.)  The focus here is on the integrity of the jury process and its bearing on defendant's fundamental right to a fair trial.  As discussed, the jurisprudence developed in the juror concealment and bias cases provide guidance on the inquiry and analysis necessary on remand to determine whether the right to a fair trial was violated.

For all of the foregoing reasons, we will remand the matter with directions to the trial court to vacate its order granting the motion for a new trial and reconsider the motion

24.

under the applicable law as discussed herein.  We express no opinion as to whether the motion for new trial should be granted or denied.

## DISPOSITION

The cause is remanded for further proceedings consistent with this opinion, which shall include vacating the challenged order and reconsideration of defendant's motion for new trial.

PEÑA, Acting P. J.

I CONCUR:


MEEHAN, J.

25.

SNAUFFER, J., Concurring.

I agree with the remand to the trial court for further consideration.

This is a very unusual case that to some extent defies conventional legal analysis. In my view, the central issue for the trial court to decide on remand is whether the defendant had a right to know and rely upon the fact that the jurors both defendant and the prosecutor agreed to decide the case were in reality who they were supposed to be. I submit that the error in this case occurred when the jury was sworn, with one juror who not only should not have been present, but was not in fact the person everyone believed him to be.

It will be for the trial court, exercising its considerable discretion, to decide whether this produced a fair trial, or justified the granting of a new trial under the appropriate legal standards.

SNAUFFER, J.